E-Filed: **5/14/09**

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| RAMBUS INC.,<br><br>Plaintiff,<br><br>vs.<br><br>HYNIX SEMICONDUCTOR INC., et al.,<br><br>Defendants. | Case No. C 05-00334 RMW |
| RAMBUS INC.,<br><br>Plaintiff,<br><br>vs.<br><br>SAMSUNG ELECTRONICS CO., LTD., et al<br><br>Defendants. | Case No. C 05-02298 RMW<br><br>**FINDINGS OF FACT AND CONCLUSIONS OF LAW WITH RESPECT TO SAMSUNG'S COUNTS I-III AND ESTOPPEL DEFENSE**<br><br>**[REVISED REDACTED]** |

These Findings of Fact and Conclusions of Law concern the court trial of that portion of the dispute between Samsung Electronics Co., Ltd., Samsung Electronics America, Inc., Samsung Semiconductor, Inc. and Samsung Austin Semiconductor, L.P. (collectively "Samsung") and Rambus Inc. ("Rambus") based upon the allegations set forth in Counts I-III of Samsung's Counterclaims against Rambus in Action Nos. C-05-00334 RMW and C-05-02298 RMW. Samsung alleges that: (1) Rambus breached § 3.8 of the SDR/DDR IC and SDR/DDR Memory Module Patent License Agreement Between Rambus, Inc. and Samsung Electronics Co., Ltd. ("2000 SDR/DDR License," "License" or "Agreement") by failing to notify Samsung of

1

1  the more favorable license rate it gave to Infineon and by refusing to provide that rate to

2  Samsung (Count I); (2) Rambus breached § 8.5 by failing to negotiate in good faith an extension

3  of the License (Count II); and (3) Rambus breached the covenant of duty of good faith and fair

4  dealing implied in the License by failing to adjust the royalty rate paid by Samsung under the

5  License to match the lower effective royalty rate provided for in the Rambus/Infineon License

6  and by failing to negotiate an extension in good faith (Count III).

7          These Findings of Fact and Conclusions of Law also cover Samsung's affirmative defense

8  of equitable estoppel whereby Samsung asserts that Rambus is equitably estopped from taking

9  actions against Samsung that are inconsistent with the Rambus/Infineon license.

10         The evidentiary portion of the trial was conducted by the court begining on September 22,

11  2008 and concluding on October 1, 2008.  These Findings of Fact and Conclusions of Law are

12  based on the evidence received during that trial which included, by stipulation, the relevant

13  evidence admitted in the prior jury trial of monopolization and related claims brought by the

14  Hynix, Micron, and Nanya entities against Rambus.  *Hynix Semiconductor Inc. v. Rambus Inc.*;

15  *Rambus Inc. v. Hynix et al.*; *Rambus Inc. v. Micron Technology et al.,* Nos. C-00-20905 RMW,

16  C-05-00334 RMW, C-06-00244 RMW ("Coordinated Jury Trial").  The jury verdict was

17  rendered on March 26, 2008.

18                              **FINDINGS OF FACT**

19  **A.     Chronology**

20         1.      Rambus was founded in 1990 by two professors, Dr. Michael Farmwald and

21  Dr. Mark Horowitz, who had been working together to address the increasing gap between

22  microprocessor performance and DRAM performance.  Jury Tr. at 4079:8-4081:24, 4091:9-

23  4095:10, 5489:23-5490:3.[1]

24         2.      On April 18, 1990, Drs. Farmwald and Horowitz filed a patent application, serial

25  number 07/510,898 ("the '898 application"), containing numerous claims relating to their efforts

26  to solve this performance gap problem.  Exh. 5131.

27

28  [1] References herein to "Jury Trial Tr." refer to the transcript of the Coordinated Jury Trial.  References to
    "Trial Tr." refer to the transcript of the September 22, 2008 trial.  References to "Exh." refer to admitted
    trial exhibits in either the Coordinated Jury Trial or the September 22, 2008 trial.

3.      On April 16, 1991, Rambus filed an international patent application pursuant to the Patent Cooperation Treaty (the "PCT application"). Exh. 3583. The PCT application was published on October 31, 1991. The specification contained in the PCT application was identical to that contained in the '898 application and described, according to Rambus, the inventions that are at issue in Rambus's infringement claims against Samsung in the above-captioned actions. *id.*

4.      On April 7, 1992, Geoff Tate, Rambus's Chief Executive Officer, provided Dr. Yong Park, Samsung's Senior Vice President of Business Development and Product Planning, with a copy of the PCT application. Exh. 10667.

5.      Rambus received its first issued U.S. patent resulting from the '898 application in September 1993. Exh. 3219. The '898 application resulted in the filing over time of numerous continuation and divisional applications. Exh. 8888. Some of the patents that resulted from this process are at issue in the above-captioned cases but the first of those patents did not issue until January 30, 2001 (U.S. Patent 6,182,184).

6.      On November 7, 1994, Rambus and Samsung began a business alliance when they entered into an agreement entitled the Semiconductor Technology License Agreement ("RDRAM Agreement"). Exh. 6110. This agreement covered certain intellectual property used in the manufacture and sale of RDRAM devices and required Samsung to pay license fees and several different percentage-of-net-sales royalties. *Id.* § 4.2(a).

7.      In 1996, Intel announced that it planned to endorse "Rambus-2," a next generation version of Rambus's proprietary DRAM technology (later known as Direct RDRAM). Jury Tr. at 3000:18-3003:11.

8.      In 1996 and early 1997, Rambus and Samsung renegotiated the 1994 RDRAM Agreement resulting on February 7, 1997 in the execution of Addendum No. 1 to Semiconductor Technology License Agreement to cover Rambus's next-generation memory technology, Direct RDRAM. Trial Ex. 4201.

9.      As of 2000, Rambus described its goal to establish Rambus DRAM as the dominant memory in the industry as "[o]ur #1 priority." Trial Ex. 4009 (Hitachi Settlement Q&A) at 6; Trial Tr. at 740:1-6 ("We wanted RDRAM to be as successful as possible in 2000" . . . .), 740:19-741:1 (". . . that would make it the most dominant memory if it were to be the most

1   successful. . . . "), 741:2-24 (". . . we continued to work hard to make RDRAM successful.").

2        10.    At that time, Samsung was the top supplier of RDRAM memory devices and

3   accounted for more total RDRAM sales than the next three suppliers combined. Trial Tr. at

4   195:2-15, 739:15-25, 740:11-18; Trial Ex. 3209 (Summary of Worldwide DRAM Sales, 1996-

5   2006).

6        11.    On July 25, 2000 representatives of Rambus and Samsung first met to discuss a

7   potential license covering SDR and DDR products.  Exh. 4204.

8        12.    On August 8, 2000 Rambus initiated patent infringement litigation against

9   Infineon Technologies, Inc. ("Infineon") in which Infineon's defenses included unclean hands for

10  alleged spoliation of documents.  Exh. 4264.

11       13.    On October 27 and October 31, 2000, Rambus and Samsung respectively signed

12  the 2000 SDR/DDR License.  Exh. 4226.  The SDR/DDR License had an effective date of July 1,

13  2000 and a five-year term extending through June 30, 2005.  *Id.* §§ 1.1, 8.1.  It included a most

14  favored licensee provision, a provision for the audit of Samsung's sales for royalty payment

15  verification purposes, and an agreement to negotiate an extension or new agreement in good

16  faith. *Id.* §§ 3.8, 4.1 and 8.5.  In an On October 27 and October 31, 2000, Rambus and Samsung

17  respectively signed the 2000 SDR/DDR License.  Exh. 4226.  The SDR/DDR License had an

18  effective date of July 1, 2000 and a five-year term extending through June 30, 2005.  *Id.* §§ 1.1,

19  8.1.  It included a most favored licensee provision, a provision for the audit of Samsung's sales

20  for royalty payment verification purposes, and an agreement to negotiate an extension or new

21  agreement in good faith. *Id.* §§ 3.8, 4.1 and 8.5.  In an e-mail dated October 31, 2000 from Jay

22  Shim, Samsung's chief negotiator, to Neil Steinberg, Rambus's chief negotiator, Mr. Shim

23  advised that Samsung had executed the Agreement but that he was working on a post-execution

24  amendment, as they had discussed, to revise the wording of Section 8.5 to address a most

25  favorable royalty condition in an extension or new agreement.  Exh. 4227.

26       14.    On November 7, 2000, Mr. Shim sent an "amendment proposal" to Steinberg

27  via email.  Exh. 4230 at 1.  On November 21, 2000, Mr. Steinberg sent an email responding to

28  Mr. Shim's proposed Amendment.  Exh. 4232 at 1.  Neither of these proposed amendments to the

2000 SDR/DDR License was ever signed or assented to by the parties.  Trial Tr. at 248

4

1  (testimony of J. Shim).

2      15.    In July 2001 the parties did negotiate and execute an amendment regarding

3  renewal of their Agreement. Exh. 4240 (Amendment No. 1). As executed, this amendment

4  imposed an obligation on Rambus to negotiate a renewal agreement "solely and exclusively" with

5  respect to "Licensed Products," as that term was defined under the SDR/DDR License. Exh.

6  4240 ¶ 1 ("This Amendment No. 1 relates solely and exclusively to SDR SDRAM, SDR

7  SGRAM, DDR SDRAM and DDR SGRAM as defined in the Agreement . . . ."). Rambus signed

8  Amendment No. 1 on July 10, 2001, and Samsung signed on July 18, 2001. Exh. 4240.

9  Amendment No. 1 provided, among other things, that if Rambus licensed Infineon, it could

10  terminate the Amendment on 10 days notice. *Id.*

11      16.    In December 2003, Rambus notified Samsung that Rambus would be conducting

12  a royalty audit pursuant to Section 4.1 of the SDR/DDR License. Trial Tr. at 256:6-14.

13      17.    By at least July 2004, Rambus pressed Samsung to begin renewal negotiations for

14  a license that would replace or follow the expiration of the SDR/DDR License.

15      18.    Samsung and Rambus representatives met on July 9, 2004 in Korea (Trial Tr.

16  at 259:3-17, 945:22-946:6) but Mr. Shim's position on behalf of Samsung was that there was "no

17  need to rush." *Id.* at 951:13-952:21.

18      19.    On January 25, 2005, Rambus sued Hynix, Infineon, Nanya, and Inotera

19  Memories, Inc. for infringement of certain Rambus patents. Case No. 05-00334 RMW ("'334

20  case").

21      20.    On February 20, 2005, Mr. Blumberg, Vice President of Licensing for Rambus

22  and Rambus's chief negotiator at the time, sent an offer for renewal to Mr. Shim. Trial Tr. at

23  950:13-22; Exh. 4263 (hereinafter the "February 20 Renewal Offer").

24      21.    On March 21, 2005, Rambus and Infineon executed a Settlement and License

25  Agreement resolving the litigation between them. Exh. 4264 (Infineon Settlement and License

26  Agreement). The settlement was favorable to Infineon because the judge presiding over the case

27  had announced his intent to dismiss it based upon Rambus's alleged unclean hands (spoliation of

28  documents).

    22.    Samsung requested that Rambus make the Infineon royalty rate effective for

1 | Samsung under Section 3.8 of the 2000 SDR/DDR Agreement, but Rambus refused. 1014:12-18
2 | ("Mr. Shim said he wanted the Infineon deal and you said no; isn't that true? At that time, that is
3 | true.").

4 |       23.     On March 22, 2005 Rambus notified Samsung that it was terminating
5 | Amendment No. 1. Exh. 4265 (Letter from I. Blumberg to Samsung re: Notice of termination of
6 | Amendment No. 1 to the SDR/DDR IC and SDR/DDR Memory Patent License Agreement
7 | ("Amendment"), dated Mar. 22, 2005) ("I am sending this notice of termination pursuant to
8 | Section 7 of the Amendment. This letter is that notice of termination and the Amendment shall
9 | terminate automatically ten days after this notice."). Ten days thereafter, the relationship between
10 | Samsung and Rambus with respect to SDRAM and DDR SDRAM memory devices was again
11 | governed by the 2000 SDR/DDR License.

12 |       24.     On April 1, 2005 Mr. Blumberg wrote to Mr. Shim and withdrew Rambus's
13 | February 20 Renewal Offer. Exh. 4268.

14 |       25.     On May 18, 2005, Mr. Blumberg sent a further proposal to Mr. Shim. In this
15 | proposal, Blumberg suggested the parties workout a one year standstill agreement. Exh. 4271.
16 | He advised that "[c]onclusion of such an agreement before July 1 remains a top priority for
17 | Rambus." *Id.* Blumberg set forth a series of specific terms for a one year standstill.

18 |       26.     On June 3, 2005, Mr. Shim responded with Samsung's standstill offer. Exh. 4273;
19 | Trial Tr. at 968:10-13. No standstill or other agreement was ever successfully negotiated.

20 |       27.     On June 6, 2005 Rambus terminated the 2000 SDR/DDR Agreement citing
21 | Samsung's "failure to comply with the auditing provisions of Section 4[.]" Trial Tr. at 304:5-14;
22 | 305:5-8; Trial Ex. 4276 (Letter from J. Danforth to J. Shim, dated June 6, 2005) ("[d]espite
23 | having ample opportunity to cure since receiving written notice, Samsung still has not complied
24 | with these auditing provisions. This letter is to inform you that in view of Samsung's continued
25 | breach and failure to cure . . . Rambus hereby immediately terminates the SDR/DDR License
26 | Agreement."). Rambus filed its First Amended Complaint in the '334 case on June 6, 2005,
27 | asserting the same patents as in the original complaint but adding Samsung as a defendant. On
28 | June 6, 2005, Rambus also sued Samsung in a separate suit alleging infringement of certain
    Rambus patents. Case No. 05-02298 RMW ("'2298 case").

**B.      Factual Findings on Specific Claims**

    **1.      Section 3.8 of the SDR/DDR License Was Triggered by the Rambus/Infineon Settlement Agreement**

       The parties dispute whether Section 3.8 of the SDR/DDR License was triggered by the Rambus/Infineon Settlement Agreement obligating Rambus to give Samsung the benefit of a royalty rate calculated in accordance with the Rambus/Infineon Settlement Agreement which provided for Rambus to receive a lump-sum payment in installments.  The court makes the following factual findings relevant to that issue.

       a.  Rambus represented in the 2000 SDR/DDR License its intent with respect to licensing manufacturers then in litigation with Rambus:

> WHEREAS, Rambus represents that, after November 1, 2000, the royalty rates offered to any semiconductor memory manufacturer which is currently in litigation with Rambus for infringement of any Rambus Patent, as defined herein, shall be the standard royalty rates and such standard royalty rates are higher than the royalty rates set forth in Section 3.1(b) of this Agreement; and
>
> WHEREAS, Rambus further represents that royalty rates offered after January 1, 2001 to all prospective licensees shall be such standard royalty rates.

Exh. 4226 (2000 SDR/DDR Agreement) p. 2.

       b.  Rambus specifically extended most favored licensee protection to Samsung in the SDR/DDR License:

> 3.8      *If at any time during this Agreement, the royalty rate agreed to be paid or ordered to be paid by a Third Party, whether by settlement or by court or agency order, for products corresponding to SDR SDRAM, SDR SGRAM, DDR SDRAM, or DDR SGRAM is lower than that specified in Section 3.1(b) of this Agreement, Rambus shall notify Samsung, in writing, within ten (10) days of the effective date of such lower royalty rate and such lower royalty rate shall be effective for this Agreement the first day of the royalty reporting period in which written notice by Rambus is made.  If the lower royalty rate is limited geographically due to a court or agency order, then Samsung's lower royalty rate shall be similarly limited to sales in the same geographic area. Should, by agreement, subsequent order, or amendment, modification, or reversal of the court or agency order (whether on appeal or otherwise), the lower royalty rate of any litigant change, then the royalty for Samsung shall change correspondingly, but not to exceed the rates specified in Section 3.1(b).*

*Id.* § 3.8 (Emphasis added).

       c.  The negotiation of the parties leading up to the execution of the SDR/DDR License shows the importance to Rambus of the License and Rambus's unconditional assurance to Samsung of most favored licensee status.

1      i. During the course of the negotiations, Mr. Shim, representing Samsung,

2 and Mr. Steinberg, representing Rambus, served as the primary negotiators of the 2000

3 SDR/DDR Agreement.  Trial Tr. at 211:12-20, 383:14-385:5.

4      ii. At the parties' July 25, 2000 meeting, Rambus told Samsung that it was

5 "a valuable and very good partner," and that Samsung was "in an excellent position to secure the

6 most favorable terms" if it signed the SDR/DDR License quickly.  Trial Ex. 4024 at 2-3; Trial Tr.

7 at 205:22-206:15, 703:25-704:18.

8      iii. Mr. Steinberg stressed the importance of the Samsung/Rambus

9 relationship, and he emphasized that Rambus wished to continue that relationship and grow and

10 prosper with Samsung.  Trial Tr. at 205:22-206:3.

11      iv. On August 10, 2000, Mr. Steinberg sent Rambus's first draft of the

12 License to Mr. Shim. Trial Ex. 4208 (Email from N. Steinberg to J. Shim, dated Aug. 10, 2000);

13 Trial Tr. at 206:24-207:14.

14      v. The August 10, 2000 draft agreement did not contain a most favored

15 licensee provision or recitals stating that future licensees would be offered standard royalty rates

16 that would be higher than Samsung's royalty rates. Trial Ex. 4209 (Draft - SDR/DDR Patent

17 License Agreement between Samsung and Rambus); Trial Tr. at 208:3-16.

18      vi. On September 13, 2000, Geoff Tate, Rambus's Chief Executie Officer,

19 sent an updated negotiation schedule to Samsung's Y.W. Lee and assured him that entering the

20 agreement "will give Samsung the best possible terms and will result in Samsung having a

21 competitive advantage over those who have sued us rather than negotiate." Exh. 4212 (Email

22 from G. Tate to Y.W. Lee, dated Sept. 14, 2000).

23      vii. On October 6, 2000, Mr. Shim sent Samsung's Term Sheet Proposal

24 to Rambus, which contained proposals for, *inter alia*: (1) "[a] provision specifying that in the

25 event the Rambus Patents are held to be unenforceable against any third party, it is agreed that

26 they (Rambus Patents) are unenforceable against Samsung"; (2) "[a] provision specifying that in

27 the event the Rambus Patents are held to be expressly or impliedly licensed based on Rambus's

28 activities as a member of JEDEC, it is agreed that Samsung's royalty rates shall be the lower of

 that agreed to in the Agreement or that ordered by a court or an agency"; and (3) "[a] Most

1   Favorable Nations Clause in which Samsung is guaranteed to (i) the lowest possible royalty rates

2   and fees among all licensees, and (ii) a right to amend the royalty terms of the Agreement in the

3   event a court decision or an out-of-court settlement renders, after the execution of the

4   Agreement, lower royalty terms than agreed to, wherein such new lower royalty terms shall apply

5   to Samsung retroactively and Rambus shall refund the difference therein." Exh. 4214. The Term

6   Sheet Proposal also included a recital stating that following the execution of the Agreement with

7   Samsung higher royalty terms would take effect for any future third party licensees. *Id.*; *see* Trial

8   Tr. at 215:5-19 (the MFL provision was an "essential condition" to Samsung).

9            viii.  On October 11, 2000, Rambus revised the draft agreement, adding,

10   *inter alia*, most favored licensee protections and a representation that the royalty rates offered to

11   future licensees then in litigation with Rambus would be standard royalty rates higher than those

12   in the 2000 SDR/DDR Agreement. Exh. 4217 (Redline comparing Oct. 11th and Oct. 16th drafts

13   of the 2000 SDR/DDR Agreement); Trial Tr. at 428:22-429:1.

14            ix.  On October 16, 2000, Mr. Shim requested revisions to the October 11

15   draft agreement, including an elaboration of the draft most favored licensee language to be in a

16   new section 3.8 with subparts (a) through (e) that specifically addressed, *inter alia*: a lower

17   "royalty paid by a Third Party, whether by settlement or by court or agency order"; either "no

18   royalty or a royalty based on a lower royalty rate" "[s]hould a court or agency of competent

19   jurisdiction make a determination that the Rambus Patents in suit are not enforceable or are

20   invalid"; and a method for adjusting royalty terms "should any Third Party be granted a license

21   on the basis of consideration other than a running royalty (for example, a lump sum)." Exh. 4215

22   at 4-5. Mr. Shim's proposal did not expressly address flat royalty payments payable on a

23   quarterly basis.

24            x.  Later the same day, Mr. Steinberg responded without addressing the

25   issue of "a lump-sum" royalty and stated that he had amended the most favored licensee

26   provisions "to provide language expressing the fundamental intent of Section 3.9 that Samsung

27   not be put at a competitive disadvantage as a result of entering into the Agreement." Exh. 4216 at

28   2.

         xi.  Along with his e-mail, Mr. Steinberg enclosed a draft that, among

1    other things: (a) contained a most favored licensee provision that did not explicitly cover licenses

2    granted in settlements or pursuant to court or agency order; and (b) contained limited most

3    favored licensee protection related to Rambus's participation in JEDEC.  Exh. 4408 (Draft -

4    SDR/DDR Patent License Agreement between Samsung and Rambus, dated Oct. 16, 2000); Exh.

5    4217 (Redline - SDR/DDR Patent License Agreement between Samsung and Rambus, dated Oct.

6    16, 2000).

7                 xii.  The October 16, 2000 draft agreement amended Section 3.9 to

8    include: "If at any time during the term of this Agreement, the parties desire to discuss the royalty

9    rate to be applied . . . pursuant to this Section 3.9, the parties shall meet to negotiate in good faith

10    with a view to determining a mutually satisfactory prospective royalty rate so that Samsung is not

11    at a competitive disadvantage relative to any Third Party."  Exh. 4217 (Redline - SDR/DDR

12    Patent License Agreement between Samsung and Rambus, dated Oct. 16, 2000) (emphasis

13    added) at 19.

14                 xiii.  The October 16, 2000 draft agreement also included an additional

15    WHEREAS clause representation that higher standard royalty rates would be offered "to all

16    prospective licensees" after January 1, 2001.  *Id.* at 2.

17                 xiv.  On October 17, 2000, Mr. Tate sent an email to Mr. Y.W. Lee urging

18    Samsung to "sign now" and stating that he believed Rambus had met most of Samsung's

19    requests, including "most favored royalty rate" and a "commitment that Samsung won't be at a

20    competitive disadvantage as a result of the outcome of pending litigation." Exh. 4218.

21                 xv.  In his October 17 email to Samsung, Mr. Tate wrote "[a]s you know

22    we are in court with [Hynix], Micron and Infineon. We expect to win our legal battles with them

23    although we don't control the schedule of the courts. When these companies choose to negotiate

24    license terms with us we will charge them substantially higher license fees and royalty rates." *Id.*

25                 xvi.  Mr. Tate also wrote to Mr. Y.W. Lee, in the October 17 email,

26    "Samsung and Rambus have enjoyed a very positive relationship the last several years, especially

27    since you have become directly involved with us.  I know I have a high degree of personal trust

28    in you; and I hope you as well feel that during our relationship that my actions have followed up

   on my commitments." *Id.*

1          xvii.  On October 21, 2000, Mr. Steinberg sent Mr. Shim a revised

2 agreement, executed by Rambus and dated October 20, 2000, and urged Samsung to "take[] this

3 opportunity to gain a long term competitive advantage over several of its fiercest competitors!"

4 Exh. 4222.

5          xviii.  The October 20 draft agreement removed the prior most favored

6 licensee language in Sections 3.8-3.10, and substituted broader language similar to Mr. Shim's

7 proposed 3.8(a) and 3.8(b).  Exh. 4221 (Redline - SDR/DDR Patent License Agreement between

8 Samsung and Rambus, dated Oct. 20, 2000) at 18-19.

9          xix.  On October 27, 2000, Mr. Steinberg sent an executed copy of the

10 final agreement to Mr. Shim. Exh. 4224.

11          xx.  On October 31, 2000, the Agreement was fully executed by Jon Kang,

12 Vice President of Samsung Electronics, Co., Ltd.  Exh. 4226.

13          xxi.  On November 2, 2000 Mr. Tate assured Samsung that it "now has the

14 best deals on both RDRAM and SDRAM/DDR SDRAM." Exh. 4229.

15          xxii.  The negotiating history of the final contract language in Section 3.8

16 demonstrates that the parties intended to cover different types of royalty rates, including a flat,

17 periodic royalty (e.g., an amount per calendar quarter).  This is evident from, among other things,

18 the parties' discussion that Samsung would not suffer competitive harm if it accepted a license,

19 that all licensees would receive standard "royalty rates," and that the most favored licensee

20 provisions would also cover any "royalty rate," even if it arose from a litigation settlement.  Trial

21 Tr. at 228:14-229:23.

22         d.  Rambus's argues that the terms of Amendment No. 1 executed in July 2001

23 supports its argument that the parties only intended section 3.8 to cover "running royalties" and

24 did not intend to cover "a lump sum" as provided in the Rambus/Infineon settlement because the

25 parties expressly addressed "a lump sum" in the context of Amendment No. 1's provision

26 regarding a duty to negotiate a license renewal.  Exh. 4240.  The argument is not persuasive.  The

27 2001 Amendment was negotiated under different circumstances and at a different time, and it

28 does not address the meaning of "royalty rate" (including in the context of the most favored

licensee provision) or its application to flat payments, each one of which is payable on a quarterly

1    basis. More importantly, the extrinsic evidence unequivocally shows that Rambus assured

2    Samsung that no third party would get a better deal on the use of Rambus's DDR/SDR

3    technology than Samsung as Rambus desperately wanted and needed a deal with Samsung.

4              e. Other extrinsic evidence supports Rambus's intent to provide broad

5    most favored licensee protection to Samsung.

6              i. The customary meaning of the term "royalty rate" in patent

7    licenses includes various types of royalty payment structures, including a percentage of net sales,

8    a periodic, flat payment or variable flat payment per unit of time (e.g., $5.85 million per calendar

9    quarter, subject to a cap, at which point the rate becomes $0 per quarter until a triggering event

10   occurs). Trial Tr. at 193:9-20, 579:2-582:1.

11             ii. When comparing licensing terms, it is common in a wide variety of

12   industries, including with respect to patent licensing, to compare a running royalty with a

13   periodic, lump-sum royalty by calculating an effective royalty rate or by simply comparing the

14   lump sum amounts due on a quarterly basis for various types of royalty structures. Trial Tr. at

15   193:21-194:7, 614:3-616:3.

16             iii. Rambus used the terms "rate" and "royalty rate" when referring to

17   flat quarterly royalty payments, both in its contracts and in its license negotiations. *See*, e.g.,

18   Exh. 4245 (Email from D. Mooring to J. Huang, dated Mar. 15, 2004) ("A discounted royalty

19   rate [probably a flat quarterly payment] until a trigger event ████████████████████

20   ████████████████████████████████; Exh. 4244 (Email from D. Mooring

21   to J. Huang, dated Mar. 9, 2004) ("A royalty rate that starts out with a discounted, flat quarterly

22   payment for two years, and then moves to Rambus's standard royalty rates with certain 'most

23   favored' customer rates"); Exh. 4246 (Email from D. Mooring to D. Orton, dated Mar. 8, 2004)

24   (same); Exh. 4249 (Amendment No. 2 to Elpida-Rambus Patent License Agreement, dated June

25   5, 2004 includes Rambus's Amendment No. 2 to its Patent License Agreement with Elpida,

26   executed on June 5, 2004, ████████████████████████████████████

27   ████████████████████████████████████████

28   ████████████████████████████████

              iv. The Infineon Settlement and License Agreement itself refers to the

1   payments owed to Rambus under that agreement as either a "royalty" or "royalties." Exh. 4264

2   (Infineon Settlement and License Agreement) Arts. 9.1(b) ("If there is an Assignee License

3   Agreement, then Rambus and the Successor Entity shall negotiate, diligently and in good faith,

4   an appropriate ████████ . . . . If within ████████████████████████ and

5   the ████████ do not reach agreement on the ████████████████████████

6   ████████████████████ 9.1(b)(1) ("Distribution of a ████████████

7   ████████ should not obligate the ████████████ to ████████ under both ████████ above

8   and under the terms of the Assignee License Agreement."), 9.1(b)(3) ("Rambus should be able to

9   ████████████████████, with respect to ████████████

10  ████████████████████████████ that would be payable if

11  there were no Assignee License Agreement."), 9.1(b)(5) ("For example, ████████████

12  ████████ provided for payment to Rambus of ████████████████ for the right to

13  make and sell up to ████████████████, then Rambus would retain this ████

14  ████████████, but there would be ████████████ of the ████████

15  ████████████████████ 9.4(b) ("If there is a ████████████

16  ████████ then Rambus and the Successor Entity shall negotiate, diligently and in good faith,

17  an appropriate ████████████ 9.4(b)(3) ("Rambus should be able to ████████████

18  ████████████████, with respect to ████████████████

19  ████, to the extent such ████████████████ that would be payable if there were no

20  ████████████████ 9.4(b)(5) (". . . Rambus would retain this ████████

21  ████████████████ there would be ████████████ of the ████████████

22  ████████████, and 11.2 ("Prompt adjustment shall be made by Infineon to compensate for

23  any errors and/or omissions disclosed by such examination or audit which result in an

24  underpayment of *royalties* hereunder . . . .")(Emphasis added).

25           v.   In Rambus and Infineon's Settlement and License Agreement executed

26  on March 21, 2005 resolving their patent infringement litigation Rambus granted Infineon a

27  license under all of its existing patents and pending applications for the products set forth in

28  Section 3.8 of the 2000 SDR/DDR Agreement, as well as other products. Exh. 4264, 4 at § 1.8

    (Memory IC); 3 at § 1.6 (Infineon Licensed Products); 5 at § 2.2 (Scope of License). In

1    exchange, Infineon agreed to pay a variable royalty rate, which typically was $5.85 million per

2    quarter up to a total royalty cap of $50 million, at which point it became $0 per quarter unless

3    and until a new triggering event occurred. *Id.* at 12; Exh. 4265 (Facsimile from I. Blumberg to J.

4    Shim, dated Mar. 22, 2005, attaching Press Release regarding Rambus-Infineon Settlement) at 3;

5    Trial Tr. at 587:7-18, 603:4-11. The Infineon Settlement and License Agreement contains a

6    provision (i.e., Article 6) that on its face contains the amounts agreed to be paid by Infineon. Exh.

7    4264 Art. 6; Trial Tr. at 606:2-607:2. Other terms of the agreement demonstrate that the

8    quarterly payment obligation in Article 6 was the basis used by the parties to determine Infineon's

9    royalty obligation. Exh. 4264 Art. 2.3; Trial Tr. at 607:3-25. For example, Article 2.3 is a most

10   favored licensee provision granted to Infineon, ██████████████████████████████████████

11   ██████████████████████████████████████. *Id.* Likewise, multiple provisions of the

12   agreement refer to the quarterly payment obligation as a royalty. Exh. 4264 Arts. 9.1(b),

13   9.1(b)(1), 9.1(b)(3), 9.1(b)(5), 9.4(b), 9.4(b)(3), and 11.2.

14                    vi. In their joint press release created pursuant to the terms of the Infineon

15   Settlement and License Agreement, the parties described the quarterly payments agreed to be

16   paid by Infineon as the consideration granted "in exchange" for the license grant to Infineon, and

17   described the various dismissals and releases as "in addition to" these payments. *Id.*

18                    vii. Rambus admitted in various filings with the Securities and Exchange

19   Commission that the Infineon Settlement and License Agreement contained a royalty rate in the

20   form of Infineon's quarterly payment obligation. Exh. 4450 (Rambus Inc. S.E.C. Form S-3/A,

21   dated May 11, 2005) at 7 ("[A]ll licenses provide that Infineon will be treated as a 'most-favored

22   customer' of ours which could result in Infineon's US $5.85 million quarterly payment being

23   reduced if future Rambus licensees receive a lower royalty rate."); *id.* at 11 ("Failure to achieve

24   positive results in litigation will also result in a failure to trigger certain contractual provisions

25   which would convert certain flat rate royalty arrangements to per unit royalties. Any or all of

26   these adverse results could cause a substantial decline in our revenues."); *id.* at 13 ("...require

27   Infineon to pay us up to an additional $100 Million in royalty payments."); Exh. 4451 (Rambus

28   Inc. S.E.C. Form 10-Q, dated May 9, 2006) at 39 ("Our license with Infineon, which was part of

our settlement, provides for the extension of certain benefits under that license to a successor in

1   interest that, under certain conditions, acquires all of Infineon's DRAM operations.  If such an

2   acquisition were to occur, such successor would be entitled to the extension of such benefits,

3   including the ability to pay a royalty calculated by multiplying the Infineon rate by the percentage

4   increase in DRAM volume represented by the successor company's combined operations.  Such

5   an extension of benefits could also make it more difficult for us to obtain the royalty rates we

6   believe are appropriate from the market as a whole.  Such an extension of benefits would, in

7   addition, also operate to extend a release of claims to such successor, thus reducing the number

8   of companies to which we believe we are entitled to look for compensation for the antitrust

9   injury alleged by us in our pending San Francisco antitrust action."); *id.* at 46 (". . . require

10  Infineon to pay us up to an additional $100 Million in royalty payments.") and 47 (". . . Infineon

11  will be required to make additional royalty payments to us which may aggregate up to $100.0

12  million.").

13          g.  Samsung's initial royalty rates, which were expressly subject to section 3.8 of

14  the SDR/DDR License, were calculated by multiplying Samsung's net sales of Licensed Products

15  by certain percentages (which ranged from .75% to 3.5% for SDR or DDR SDRAM).  Exh. 4226

16  at § 3.1.  Notably, Samsung's royalty payments were due on a calendar quarter basis and therefore

17  could be readily compared to different types of royalty structures that were likewise due on a

18  quarterly basis.  *Id.* at § 4.2; Trial Tr. at 614:3-616:3.  Infineon's quarterly payment obligation

19  was far lower than Samsung's quarterly payment obligation under Section 3.1 of the 2000

20  SDR/DDR Agreement.  Samsung's quarterly payment obligation for the second quarter of 2005

21  would have been $46.58 million, which is eight times larger than Infineon's regular quarterly

22  payment obligation of $5.85 million.  Trial Tr. at 614:3-616:23.

23          h.  Infineon received benefits for the royalty rate it agreed to pay beyond those to

24  which Samsung was entitled to under Section 3.8 because Infineon's license term (life of the

25  patents rather than five years) and product coverage (which covered essentially all of Infineon's

26  memory products) were broader than Samsung's license.  Exh. 4264 (Infineon Settlement and

27  License Agreement) Arts. 1.8, 5.1; Exh. 4226 (2000 SDR/DDR Agreement) §§ 1.2-1.10, 3.8, 8.1.

28          i.  Infineon also received a release of liability for past infringement, as well as a

general release of all claims by Rambus, including antitrust, unfair competition, conspiracy, and

15

1  competition-based claims. Exh. 4264 (Infineon Settlement and License Agreement) Art. 4.1.

2  These factors also demonstrate how much more Infineon received than Samsung in exchange for

3  the royalty rate it agreed to pay.

4         j.  Because Infineon received substantially more in exchange for the royalty rate it

5  agreed to pay, Rambus would not have been under-compensated if it had made Infineon's royalty

6  rate effective for Samsung pursuant to its rights under section 3.8 of its SDR/DDR Agreement

7  with Rambus.  Trial Tr. at 617:17-619:11 (". . . given those assumptions . . . that Infineon had

8  more products, longer period of time, and more patents, I knew I was not underestimating the

9  relative comparison of the Samsung payments to the Infineon payments.").

10         k.  Samsung requested that Rambus make the Infineon royalty rate effective under

11  Section 3.8 of the 2000 SDR/DDR Agreement, but Rambus refused. Exh. 4268 (Letter from I.

12  Blumberg to J. Shim, dated Apr. 1, 2005) at 2; Trial Tr. at 961:2-6 ("I told Mr. Shim that the

13  Infineon Agreement involved a lump sum payment and that there was no royalty rate that would

14  be comparable in any way or that would trigger Section 3.8 of that 2000 Agreement"),

15  1014:12-18 ("Mr. Shim said he wanted the Infineon deal and you said no; isn't that true? At that

16  time, that is true."), 1021:2-8 ("I explained that there weren't any rates involved.").

17         l.  Rambus informed Samsung that the Infineon Settlement and License

18  Agreement did not contain a "royalty rate" because Infineon had agreed to pay a flat, quarterly

19  payment as opposed to a variable payment based on a percentage of net sales. Trial Tr. at

20  961:2-6, 1021:2-8.

21         m.  The evidence clearly establishes by more than a preponderance of the

22  evidence that Section 3.8 of the SDR/DDR License was triggered by the Rambus/Infineon

23  Settlement Agreement and that Rambus failed to fulfill its obligations to Samsung under Section

24  3.8.

25      **2.**    **The 2000 SDR/DDR License Did Not Cover DDR2 SDRAM and Subsequent**
               **Product Generations**

26

27         Rambus and Samsung dispute whether the SDR/DDR License granted Samsung a

license under certain Rambus patent claims to make and sell DDR2 SDRAM, GDDR3 SDRAM,

28  and subsequent generations of products.  The court finds as follows with respect to that dispute.

1              a. The SDR/DDR License granted Samsung a license under certain Rambus

2   patent claims to make and sell a specifically defined set of "Licensed Products." Exh. 4226, §

3   1.2. The term "Licensed Product" is defined under the License:

4       1.7    "DDR SDRAM(s)" means the following current double data rate
        synchronous dynamic random access memory devices of Samsung, part numbers
5       K4H280438B, K4H280838B, K4H281638B, K4H560438B, K4H560838B,
        K4H561638B, K4D62323HA, and K4D26328M. A copy of Samsung's data sheet
6       for each of the above-identified part numbers will be provided by Samsung no
        later than November 24, 2000, made Exhibit 3 to this Agreement, and hereinafter
7       referred to as "DDR SDRAM Data Sheets." "DDR SDRAM" further includes any
        double data rate synchronous dynamic random access memory device having (1)
8       the primary function of information storage and (2) a specification (as set forth in
        the data sheet for the device) identical to any specification found in any one of the
9       DDR SDRAM Data Sheets. "DDR SDRAM" additionally includes any future
        double data rate synchronous dynamic random access memory device which is
10      identical to any device identified by the above part numbers but may have [1] a
        different package type, [2] different die size, [3] different burst type, [4] different
11      clock frequency, [5] different programmable latency, [6] different programmable
        burst length, [7] different memory storage capacity, [8] different number of
12      input/output pins, [9] different timing values for existing parameters (for example,
        set-up/hold times and propagation delays), [10] different power consumption,
13      and/or [11] different number of banks (as those terms are used in the attached
        DDR SDRAM Data Sheets) from those set forth in the DDR SDRAM Data
14      Sheets. The parties agree that, if, at the discretion of the customer, a given device
        has the capability to operate as a (1) SDR SDRAM or SDR SGRAM and (2) DDR
15      SDRAM or DDR SGRAM, that device, for purposes of this agreement, shall be
        deemed to be DDR SDRAM. The parties agree that each device of the
16      above-identified part numbers is defined exclusively by its attached DDR
        SDRAM Data Sheet.

17
        1.8    "DDR SGRAM(s)" means the following current double data rate
18      synchronous graphics random access memory devices of Samsung, part number
        K4D623237M. A copy of Samsung's data sheet for the above-identified part
19      number will be provided by Samsung no later than November 24, 2000, made
        Exhibit 4 to this Agreement, and hereinafter referred to as "DDR SGRAM Data
20      sheet." "DDR SGRAM" further includes any future double data rate synchronous
        dynamic random access memory device having (1) the primary function of
21      information storage and (2) a specification (as set forth in the data sheet for the
        device) identical to any specification found in the DDR SGRAM Data Sheet.
22      "DDR SGRAM" additionally includes any future double data rate synchronous
        dynamic random access memory device which is identical to any device identified
23      by the above part numbers but may have [1] a different package type, [2] different
        die size, [3] different burst type, [4] different clock frequency, [5] different
24      programmable latency, [6] different programmable burst length, [7] different
        memory storage capacity, [8] different number of input/output pins, [9] different
25      timing values for existing timing parameters (for example, set-up/hold times and
        propagation delays), [10] different power consumption, and/or [11] different
26      number of banks (as those terms are used in the attached DDR SGRAM Data
        Sheet) from those set forth in the DDR SGRAM Data Sheet. The parties agree
27      that the device of the above-identified part number is defined exclusively by its
        attached DDR SGRAM Data Sheet.

28
    *Id.* §§ 1.7, 1.8.

1              b. Section 1.7 of the SDR/DDR License defines the term "DDR SDRAM."

2    Exh. 4226 § 1.7. DDR SDRAM is defined to include eight specific Samsung products, which

3    are identified by their part numbers, "K4H280438B, K4H280838B, K4H2281638B,

4    K4H560438B, K4H560838B, K4H561638B, K4D62323HA, and K4D263238M." *Id.*

5              c. The definition of DDR SDRAM also includes:

6          any future double data rate synchronous dynamic random access memory device
     which is identical to any device identified by the above part numbers but may

7    have a different package type, different die size, different burst type, different
     clock frequency, different programmable latency, different programmable burst

8    length, different memory storage capacity, different number of input/output pins,
     different timing values for existing timing parameters (for example, set-up/hold

9    times and propagation delays), different power consumption, and/or different
     number of banks (as those terms are used in the attached DDR SDRAM Data

10   Sheets) from those set forth in the DDR SDRAM Data Sheets.

11   *Id.*

12             d. Thus, the term "Licensed Products" in the SDR/DDR License encompasses

13   future DDR memory devices only if they are identical to the specific Samsung parts identified by

14   part number in Section 1.7 or differ only in a way described in the eleven allowed differences

15   enumerated in Section 1.7.

16             e. During negotiation of the SDR/DDR License Rambus's proposals only covered

17   narrow sets of specifically identified products. V103 (5/14/2008 Depo. of Charles Donohoe at

18   75:16-20); V102 (2/6/2001 Depo. of Charles Donohoe at 37:8-12, 99:16-100:9) (noting that

19   Rambus "wanted only certain specifically identifiable products to be covered by the agreement").

20             f. Rambus created the initial draft of the SDR/DDR License and sent it to

21   Samsung on August 10, 2000. Exhs. 4208, 4209. Section 1.7 was included in this original draft

22   of the SDR/DDR License in essentially the same form in which it appeared in the final executed

23   SDR/DDR License. Exh. 4209 at 4-5.

24             g. Samsung wanted the license agreement to cover "all products" and to obtain a

25   "complete peace accord with Rambus" so that it did not require "a continuing series of

26   negotiations as new products [came] on the market." V102 (2/6/2001 Depo. of Charles Donohoe

27   at 99:16-100:9); V103 (5/14/2008 Depo. of Charles Donohoe at 75:21-76:9). Rambus would not

28   give Samsung a total "peace accord." Instead, Rambus told Samsung that it did not want the
     license "to cover future DRAM generations." V103 (5/14/2008 Depo. of Charles Donohoe at

1    75:16-20).  Samsung's negotiators knew that DDR2 devices were not commercially available at

2    the time the SDR/DDR License was negotiated.  Trial Tr. at 222-23 (testimony of J. Shim).  In

3    fact, Samsung did not begin manufacturing DDR2 devices until two to three years after the

4    SDR/DDR License was executed.  *Id*. at 223 (testimony of J. Shim).

5              h.  Even though Samsung's attorneys knew that the company was developing

6    what would later become DDR2 devices at the time they negotiated the SDR/DDR License in

7    2000, and even though they knew that Rambus "did not want [the agreement] to cover future

8    DRAM generations," they never discussed "technical details" with Rambus during the course of

9    the negotiations.  Trial Tr. at 357, 361 (testimony of J. Shim).

10             i.  During the negotiations, Samsung tried to obtain broader language in Section

11   1.7.  On October 16, 2000, Mr. Shim requested a revision of Section 1.7 and other clauses

12   defining the products licensed under the SDR/DDR License.  Exh. 4215.  With respect to the

13   licensing of future DDR SDRAM devices, Mr. Shim asked for the license to include products

14   "substantially similar" to the devices that were identified by specific Samsung part numbers, and

15   to substitute this broader phrase in place of the existing language, which licensed only future

16   products "identical" to the specific products identified by part number, except for eleven allowed

17   and enumerated differences.  Exh. 4215 at 3.

18             j.  Rambus did "not budge" on its proposed definition of the products that would

19   be covered under the SDR/DDR License and did not want the Agreement to cover future

20   products if Samsung "changed the products down the road."  V102 (2/6/2001 Depo. of Charles

21   Donohoe at 100:3-9).

22             k.  On October 16, 2000, Mr. Steinberg sent an email stating Rambus's position

23   that it was unwilling to amend the language of Section 1.7's limitation on future DDR memory

24   devices.  Exh. 4216.  His email explained that the existing provisions, including Section 1.7,

25   "adequately cover devices which may have evolutionary (as opposed to revolutionary)

26   differences from the devices specified by part number."  Exh. 4216 at 1.  Mr. Steinberg noted that

27   any coverage of evolutionary devices was limited to the eleven allowed differences in Section

28   1.7, as drafted, *i.e.* if they were "identical to an identified device except for different package

     type, different die size, etc."  *Id.*

1            l. On October 27, 2000, Mr. Steinberg executed the SDR/DDR License on behalf

2 of Rambus.  On October 31, 2000, Jon Kang executed the SDR/DDR License on behalf of

3 Samsung.  Exh. 4226 at 28.

4            m. Section 1.7 of the final executed agreement was unchanged in all material

5 terms from the draft originally circulated by Mr. Steinberg on August 10, 2000. *Compare* Exh.

6 4209 at 4-5, *with* Exh. 4226 at 5-6.  Trial Tr. at 363 (testimony of J. Shim) (agreeing that the

7 substantive language of Section 1.7 "was never modified from the original draft").

8            n. Although Mr. Steinberg told Mr. Shim that the language of Section 1.7 should

9 "adequately cover devices which may have evolutionary (as opposed to revolutionary )

10 differences from the devices specified by part number," the parties did not change the definition

11 of the products covered or even discuss what either meant by "evolutionary."

12            o. The SDR/DDR License defines licensed memory devices and their various

13 features by reference to "Samsung Data Sheets." Exh. 4226, §§ 1.5-1.8, 1.11.  Thus, for purposes

14 of determining whether a "future double data rate synchronous dynamic random access memory

15 device" constitutes one of the "Licensed Products" within the meaning of the agreement, the

16 differences between the devices listed by part number and any such future memory devices are

17 appropriately determined by reference to their respective data sheets. *Id.* § 1.7; Trial Tr. at 854

18 (testimony of Sanjay Banerjee) (noting that "you have to read all these [eleven] categories in the

19 context of the earlier sentence, which is the specifications of the DDR data sheet").

20            p. DDR2 memory devices are not "identical" to any DDR memory devices.  Trial

21 Tr. at 529 (testimony of Carl Sechen); *id.* at 811-12 (testimony of Sanjay Banerjee).

22            q. Samsung's data sheets for its DDR2 memory devices are not "identical" to the

23 Samsung data sheets for any of the DDR memory devices listed by part number in Section 1.7.

24 Compare Exh. 4310 (64MB DDR), Exh. 4306 (256MB DDR) and Exh. 10265 (512MB DDR),

25 with Exh. 10248 (512MB DDR2), Exh. 4351 (512MB DDR2), and Exh. 10316 (1GB DDR2).

26 Trial Tr. at 529, 539-40 (testimony of Carl Sechen); *id.* at 821-22, 832-33, 836-37, 842-44, 846

27 (testimony of Sanjay Banerjee).

28            r. DDR2 is an "enhancement" over DDR memory devices, and DDR2 memory

1 │ devices contain a number of features, some of which are discussed in greater detail below, that

2 │ make them "substantially different" from the previous generation of DDR memory devices.  Trial

3 │ Tr. at 468 (testimony of Carl Sechen); *id.* at 812-13 (testimony of Sanjay Banerjee).  The various

4 │ enhancements included in DDR2 allowed memory devices to achieve a significantly higher

5 │ speed.  Trial Tr. at 468 (testimony of Carl Sechen); *id.* at 812-13 (testimony of Sanjay Banerjee).

6 │          s.  DDR2 memory devices include features, including several features identified

7 │ as "key features" in Samsung's data sheets, that do not exist in DDR memory devices.  Such "key

8 │ features" that are in DDR2 but are not in DDR include: (1) on-die termination, (2) off-chip driver

9 │ calibration, (3) differential data strobe; (4) posted CAS; and (5) programmable write latency.

10 │ E.g., Exh. 4351 at 3; Exh. 10248 at 3; Exh. 10316 at 4.

11 │          t.  All five of these features identified as "key features" appear in Samsung's

12 │ DDR2 data sheets; none of these five features appears in Samsung's DDR data sheets.  Compare

13 │ Exh. 10265 at 4 (DDR), with Exh. 10248 at 3 (DDR2); Trial Tr. at 529 (testimony of Carl

14 │ Sechen).  At least three, on-die termination, off-chip driver calibration and differential data

15 │ strobe  do not qualify as allowed differences under the definitions of "DDR SDRAM" or "DDR

16 │ SGRAM" under Sections 1.7 and 1.8 of the 2000 SDR/DDR License.

17 │          i.  On-die termination is a new feature in DDR2.  Trial Tr. at 479

18 │ (testimony of Carl Sechen); *id.* at 812-18, 821-22 (testimony of Sanjay Banerjee).  This

19 │ difference between DDR2 and DDR is reflected in the Samsung Data Sheets.  Compare Exh.

20 │ 10265 at 4 (DDR), with Exh. 10248 at 3 (DDR2).  Exh. 10248 at 9 (DDR2 data sheet reflects

21 │ addition of ODT pin), Exh. 10248 at 20-21 (DDR2 data sheet reflects addition of new

22 │ ODT-related timing parameters); Exh. 10004 at 12-15; Trial Tr. at 821-24, 828 (testimony of

23 │ Sanjay Banerjee).  On-die termination reduces the "signal reflections" that are created when data

24 │ is transmitted along the bus at very high rates. Exh. 4293 at 1.  Without on-die termination, these

25 │ signal reflections create "electrical discontinuities" that interfere with "signal integrity" and make

26 │ processing information accurately difficult for the memory device. *Id.* at 1.  With on-die

27 │ termination, however, "[e]nhanced signal performance allows for higher data rates." *Id.* at 6.  In

28 │ other words, because on-die termination makes the signal transmitting the data clearer and

therefore easier to read, it allows the system to process the data more quickly. *Id.*  Although

1   on-die termination enables or allows a memory device to operate more quickly, it does not

2   necessarily require it to do so.  Trial Tr. at 514-15 (testimony of Carl Sechen); *id.* at 817

3   (testimony of Sanjay Banerjee).  The addition of on-die termination requires changes in the

4   circuitry and is more involved than simply changing the clock frequency.  *Id.* at 514-15, 525

5   (testimony of Carl Sechen).  Either with or without on-die termination, a memory device can

6   operate with a clock frequency of 200 megahertz (corresponding to a data rate of 400 megahertz).

7   Compare Exh. 10265 at 4 (DDR device operating with clock frequency of 200 megahertz) with

8   Exh. 10248 at 3 (DDR2 device operating with clock frequency of 200 megahertz).  Trial Tr. at

9   514-15 (testimony of Carl Sechen).  Conversely, the clock frequency of a memory device can

10  change without the addition of on-die termination. Exh. 4310 at 1 (64 MB DDR at 100, 125, 143,

11  and 166 megahertz); Exh. 10265 at (512MB DDR at 333 and 400 megahertz); Trial Tr. at 807

12  (testimony of Sanjay Banerjee).  On-die termination requires new timing parameters, improves

13  the integrity of the signal, and reduces the number of errors in reading data.  Trial Tr. at 818

14  (testimony of Sanjay Banerjee).  Because on-die termination is a change from DDR technology

15  that goes beyond a mere difference in clock frequency–and beyond any other variation permitted

16  under Section 1.7–any device containing on-die termination, such as DDR2, is not a "Licensed

17  Product" under the SDR/DDR License.  Exh. 4226 § 1.7.

18          ii. Off-chip driver calibration is a new feature in DDR2.  Trial Tr. at  479

19  (testimony of Carl Sechen); *id.* at 829-34 (testimony of Sanjay Banerjee).  This difference

20  between DDR2 and DDR is reflected in the Samsung data sheets.  Compare Exh. 10265 at 4,

21  with Exh. 10248 at 3; Exh. 10248 at 14 (DDR2 data sheet reflects addition of OCD and default

22  characteristics); *id.* at 21 (DDR2 data sheet reflects addition of new OCD-related timing

23  parameter); Exh. 10004 at 9-11; Trial Tr. at 832-33 (testimony of Sanjay Banerjee).  Off-chip

24  driver calibration increases the size of the "data eye" in a memory device, i.e. the time window

25  during which a data bit can be read accurately (as either 0 or 1). Exh. 4295 at 1.  Without

26  off-chip driver calibration, variations in process, voltage, and temperature can narrow the

27  window during which the data is valid.  *Id.* at 1.  This narrowing of the data eye can "impact

28  signal integrity," making it difficult for the data to be read correctly.  *Id.* at 2.  Off-chip driver

calibration helps to keep the data eye "wide" and "tall" and thereby maintain the "quality of the

1   signaling environment." *Id.* at 1. It also helps to compensate for "variations" caused by the

2   "manufacturing and assembly processes." *Id.* at 3. Because the signal is clearer and the data eye

3   more stable, the system can operate at "higher communication speeds." *Id.* Off-chip driver

4   calibration does enable or allow a memory device to operate more quickly but does not require it

5   to do so. Trial Tr. at 514-15 (testimony of Carl Sechen); *id.* at 831 (testimony of Sanjay

6   Banerjee). The addition of off-chip driver calibration necessitates a change in the memory

7   device's circuitry. *Id.* at 514-15, 525 (testimony of Carl Sechen). The addition of off-chip driver

8   calibration is more than just a change in frequency. In fact, either with or without off-chip driver

9   calibration, a memory device can operate with a clock frequency of 200 megahertz

10  (corresponding to a data rate of 400 megahertz). Compare Exh. 10265 at 4 (DDR device

11  operating with clock frequency of 200 megahertz) with Exh. 10248 at 3 (DDR2 device operating

12  with clock frequency of 200 megahertz). Trial Tr. at 514-15 (testimony of Carl Sechen).

13  Conversely, the clock frequency of a memory device can change without the addition of off-chip

14  driver calibration. Exh. 4310 at 1 (64 MB DDR at 100, 125, 143, and 166 megahertz); Exh.

15  10265 at (512MB DDR at 333 and 400 megahertz); Trial Tr. at 807 (testimony of Sanjay

16  Banerjee). The addition of off-chip driver calibration requires new timing parameters, creates a

17  more "robust" signal, and as a result "produces fewer errors in the data." *Id.* at 831-33 (testimony

18  of Sanjay Banerjee). Exh. 10248 at 14 (DDR2 data sheet reflects addition of OCD and default

19  characteristics); *id.* at 21 (DDR2 data sheet reflects addition of new OCD-related timing

20  parameter); Exh. 10004 at 9-11. Because off-chip driver calibration is a change from DDR

21  technology that goes beyond a mere difference in clock frequency–and beyond any other

22  variation identified in Section 1.7–any device containing off-chip driver calibration, such as

23  DDR2, is not a "Licensed Product" under the SDR/DDR License.

24          iii. A differential data strobe is a new feature in DDR2. Trial Tr. at 479

25  (testimony of Carl Sechen); *id.* at 834-37 (testimony of Sanjay Banerjee). This difference

26  between DDR2 and DDR is reflected in the Samsung data sheets. Compare Exh. 10265 at 4,

27  with Exh. 10248 at 3; Exh. 10248 at 23; Trial Tr. at 836-37 (testimony of Sanjay Banerjee). A

28  differential data strobe allows the memory device to read data bits (as either 0 or 1) at a "precise

instance of time." *Id.* at 834. Without a differential data strobe, the memory device must rely on

1  only a "single data strobe" and a timing reference (provided by the crossings of that data strobe

2  with a voltage reference) which could "vary in the time domain." *Id.* This sort of variance gives

3  rise to a problem known as "timing skew," meaning that there is uncertainty about when to "read

4  in or write the data." *Id.* at 834-35. By contrast, with a differential data strobe, there are two

5  "intersecting voltage wave forms." *Id.* at 835. The crossing points of these wave forms are less

6  subject to timing skew and, therefore, provide a more exact "triggering" mechanism for the

7  memory device to read or write the data. *Id.* at 835-36. The benefit of a differential data strobe

8  is a wider "data eye" and greater accuracy. *Id.* at 836. A differential data strobe enables or

9  allows a memory device to operate more quickly but does not require it to do so. Trial Tr. at

10  514-15 (testimony of Carl Sechen); *id.* at 835 (testimony of Sanjay Banerjee). It is not possible

11  to add a differential data strobe simply by changing the clock frequency. *Id.* (testimony of Carl

12  Sechen). *Cf. id.* at 525 (testimony of Carl Sechen). Either with or without a differential data

13  strobe, a memory device can operate with a clock frequency of 200 megahertz (corresponding to

14  a data rate of 400 megahertz). Compare Exh. 10265 at 4 (DDR device operating with clock

15  frequency of 200 megahertz) with Exh. 10248 at 3 (DDR2 device operating with clock

16  frequency of 200 megahertz). Trial Tr. at 514-15 (testimony of Carl Sechen). On the other hand,

17  the clock frequency of a memory device can change without the addition of a differential data

18  strobe. Exh. 4310 at 1 (64 MB DDR at 100, 125, 143, and 166 megahertz); Exh. 10265 at

19  (512MB DDR at 333 and 400 megahertz); Trial Tr. at 807 (testimony of Sanjay Banerjee).

20  Furthermore, a differential data strobe gives rise to differences other than a potential change in

21  clock frequency. In addition to enabling a potential increase in speed, the addition of a

22  differential data strobe creates a more "certain" timing mechanism, creates a larger "data eye," a

23  more "robust" signal, and as a result creates a more accurate process for "reading and writing

24  data." Trial Tr. at 835-36 (testimony of Sanjay Banerjee). Because a differential data strobe is a

25  change from DDR technology that goes beyond a mere difference in clock frequency–and beyond

26  any other variation identified in Section 1.7 – any device containing a differential data strobe,

27  such as DDR2, is not a "Licensed Product" under the SDR/DDR License.

28  　　　　　u. Two of the new features in Samsung's DDR2 products, posted CAS and

1  programmable write latency, do appear to fall within the allowed category of a device with

2  "different programmable latency."

3               i.  The Posted CAS enhancement in Samsung's DDR2, DDR3, and

4  GDDR2 products is characterized by the inclusion of an additive latency to the CAS delay to

5  make the command and data bus efficient for sustainable bandwidths. Trial Tr. at 502:12-503:11,

6  837:9-23.  Using this approach, commands are issued externally but are held internally by the

7  device prior to execution, for the duration of the additive latency, in order to improve system

8  scheduling.  Specifically, this method helps avoid collision on the command bus and gaps in data

9  input/output bursts, which improves delays.  Additive latency is variable and is programmable.

10  Trial Tr. at 503:19-504:7, 837:24-838:14.  Posted CAS appears to fit into the allowed difference

11  of "different programmable latency." Trial Tr. at 504:24-505:10.

12               ii.  Programmable write latency is a new feature in DDR2.  Trial Tr. at 479

13  (testimony of Carl Sechen); *id.* at 844-46 (testimony of Sanjay Banerjee).  Programmable write

14  latency permits programmable adjustments to the amount of time between when the memory

15  device receives a write command and when it receives the data to be written.  Trial Tr. at 844

16  (testimony of Sanjay Banerjee).  In particular, programmable write latency was an improvement

17  on the "inflexible" DDR device, which fixed the write latency at "one clock cycle." *Id.*  The

18  extra flexibility provided by programmable write latency helps the memory device avoid

19  "collisions or gaps" in the data to be written to the memory. *Id.* at 845-46. Among other things,

20  programmable write latency enables a memory device to operate more quickly but does not

21  require it to do so. *Id.* at 531 (testimony of Carl Sechen).  Although a close question,

22  programmable write latency appears to fall into the allowed difference category of a "different

23  programmable latency" within the meaning of § 1.7. Rambus's argument that in the context of

24  the license agreement "different programmable latency" refers to different values for CAS

25  latency, a parameter that was already programmable in DDR, has some appeal.  However, the

26  parties did not limit the difference of "programmable latency" to parameters already

27  programmable in DDR.

28               u.  On-die termination, off-chip calibration and differential strobe are not

1  unrelated to clock frequency. As with many improvements to DRAM technology, the

2  "overriding objective" of these new features is to enable or allow the memory device to go faster.

3  Trial Tr. 523-24; 812-13. However, as noted above, a DDR SDRAM with one or more of these

4  enhancements is more than merely a DDR SDRAM which may have a different clock frequency.

5  The DDR2 products are not within the scope of the SDR/DDR License.

6  **3.    Rambus Was Not Entitled to Terminate the 2000 SDR/DDR License on the Purported Basis that Samsung Breached its Audit Obligation**

7

8  The parties dispute whether Rambus properly terminated the 2000 SDR/DDR

License on the basis that Samsung failed to comply with the audit requirements of the 2000

9
SDR/DDR License. The court makes the following findings of fact relevant to that issue.

10
a. The 2000 SDR/DDR Agreement contains an audit provision which

11
permits Rambus, through its designated independent accounting or licensing audit firm, to audit

12
Samsung's records and information bearing upon the amount of royalties payable to Rambus

13
under the 2000 SDR/DDR Agreement. Exh. 4226 (2000 SDR/DDR Agreement) § 4.1.

14
b. Specifically, Section 4.1 of the 2000 SDR/DDR Agreement reads:

15

16  With respect to the royalties set forth herein, Samsung shall keep complete and accurate records. These records shall be retained for a period of at least three (3) years from the date of payment, notwithstanding the expiration or other

17  termination of this Agreement. Rambus, through its designated independent accounting or licensing audit firm, shall have the right to examine and audit, not

18  more than once a year unless the preceding audit revealed an underpayment exceeding five percent (5%) of the total royalties due for the period under audit,

19  and during normal business hours, all such records and such other records and accounts as may contain, under recognized accounting practices, information

20  bearing upon the amount of royalties payable to Rambus under this Agreement. In no event will Rambus audit any given reporting period more than once. Prompt

21  adjustment shall be made by Samsung to compensate for any errors and/or omissions disclosed by such examination or audit which result in an underpayment of royalties

22  hereunder, together with interest thereon, from the date the payment was due at the 1 year U.S. Treasury bill (hereinafter "T-bill") rate, as published in the Wall Street Journal (Western Edition)

23  on the date on which the royalty was due, plus five percent (5%) per annum (or the maximum allowed by applicable law, if less). Should the amount of any such error and/or omission exceed

24  five percent (5%) of the total royalties due for the period under audit, then upon request by Rambus, Samsung shall pay for the cost of the audit. *If any three (3) consecutive audits reveal*

25  *underpayments of royalties in excess of five percent (5%), Rambus shall be entitled to immediately terminate this Agreement on notice to Samsung at any time within ninety (90) days*

26  *after such third such audit.* Should such audit disclose an overpayment of royalties hereunder, such overpayment shall be taken as a credit against future royalties, and in the event that there are

27  no future royalties, Rambus shall issue a refund          thereof.

28  Exh. 4226 (2000 SDR/DDR Agreement) at 19 (emphasis added).

c. In December 2003 Rambus requested an audit of Samsung under both Section

1   4.1 of the 2000 SDR/DDR Agreement and Section 4.3(a) of the 1994 RDRAM Agreement. Trial

2   Tr. at 256:8-14.

3          d.  Rambus selected Ernst & Young to perform the Samsung audit. Trial Tr. at

4   857:22-24.  Nigel Shepherd of Ernst & Young's San Jose, California offices led the Samsung

5   audit. Trial Tr. at 857:19-21.

6          e.  Because the inspection of Samsung's records took place in Korea, and because

7   Mr. Shepherd does not read or speak Korean, Mr. Shepherd did not personally participate in

8   performing the Samsung audit.  Trial Tr. at 877:20-878:5, 878:16-879:17, 881:12-25, 882:1-7,

9   882:24-25.

10          f.  Mr. Shepherd had a Korean team consisting of Simon Yoo and In-Sang Yoo

11   from Ernst & Young's Korean affiliate, Younghwa Accounting Firm, who performed the actual

12   audit work done at Samsung's Korean offices. Trial Tr. at 256:25-257:10, 878:6-12,

13   888:11-889:12.

14          g.  During the audit, Samsung's primary contact was Ernst & Young's Korean

15   affiliate, Younghwa Accounting Firm.  Trial Tr. at 257:10-15.  Mr. Shepherd learned about the

16   on-site audit visits and communications between Younghwa Accounting Firm and Samsung

17   through his telephone and e-mail communications with Simon Yoo and In-Sang Yoo of

18   Younghwa Accounting Firm.  Mr. Shepherd communicated his understanding regarding the

19   progress of the audit to William Deley, his primary contact at Rambus. Trial Tr. at 858:12-13,

20   883:7-10.

21          h.  On July 9, 2004, Rambus made a presentation to Samsung in which it claimed

22   that "[l]ack of data has now delayed this audit 7+ months" and that "[s]uch delay is a breach of

23   our RDRAM, SDRAM, and DDR licenses." Exh. 4251 (Samsung-Rambus Legal Update

24   Presentation, dated July 9, 2004).  In this presentation, as part of the "Proposed Next Steps -

25   Closure," Rambus requested that Samsung provide audit data from October 1, 2000 through

26   March 31, 2004. Exh. 4251 (Samsung-Rambus Legal Update Presentation, dated July 9, 2004) at

27   14.

28          i.  Mr. Shepard participated in two conference calls with Samsung and Rambus in

July 2004. Trial Tr. at 905:13-15. These conference calls took place after the July 9, 2004

meeting between Samsung and Rambus. Exh. 10228 (Memorandum from N. Shepherd to File re:

Samsung Rambus Conference Call, dated Nov. 23, 2004) (the "Background" provided in N.

Shepherd's November 23, 2004 memorandum to file states, "[t]he purpose of the call was to

follow up on the four issues raised at the July 15, 2004 conference call and subsequently

documented in the memorandum dated 7_28_04."). Mr. Shepherd's November 23, 2004

Memorandum to File states, "[c]urrently, the audit period has covered 1/1/2001 through to

12/31/2003 following discussions with E&Y and Samsung." Exh. 10228 (Memorandum from N.

Shepherd to File re: Samsung Rambus Conference Call, dated Nov. 23, 2004).

j. The Amendment No. 1 to the 2000 SDR/DDR Agreement dictated the royalties

that Samsung owed to Rambus from January 1, 2001 through April 1, 2005. Exh. 4240 (2001

Amendment); Trial Tr. at 249:22-250:2. Under Amendment No. 1, Samsung paid Rambus a

"lump sum royalty" of $3,800,000 in satisfaction of all of its royalty obligations for the first

quarter of 2001 for both memory and memory controller sales. Exh. 4240 (Amendment No. 1) §

2. Samsung thereafter paid a "fixed, lump sum royalty" of $2,000,000 every quarter "in lieu of

the royalty" required by the 2000 Agreement "for the Memory Products." *Id.* §§ 3, 5; Trial Tr. at

251:3-15, 252:1-7.

k. Because the only royalties paid on a per-unit basis under the 2000 SDR/DDR

Agreement from January 1, 2001 through December 31, 2003 were memory controllers, the audit

concerned RDRAM Products and SDR/DDR Controllers. Trial Tr. at 251:3-15, 252:1-7,

259:21-260:1.

l. During the audit, Younghwa Accounting Firm visited Samsung several times

between the spring of 2004 and the early part of 2005. Trial Tr. at 258:4-7.

m. During 2004, there were several occasions when Mr. Deley at Rambus

instructed Mr. Shepherd not to pursue further information from Samsung, and not to contact

Samsung. Trial Tr. at 860:15-20, 883:11-13. When Mr. Deley at Rambus asked Mr. Shepherd

not to contact Samsung, Mr. Shepard would inform his Korean team at Younghwa Accounting

Firm that they, too, should not initiate contact with Samsung. Trial Tr. at 885:9-16. During the

1  times when Rambus asked Mr. Shepherd not to contact Samsung, nothing was being done to

2  proceed with the audit. Trial Tr. at 885:5-21.

3       n. One of the occasions that Mr. Deley instructed Mr. Shepherd not to

4  contact Samsung was in September of 2004. V100 (Video Testimony of W. Deley) at

5  71:17-72:2. On October 4, 2004 Mr. Shepherd sent Mr. Deley an email inquiring whether Ernst

6  & Young was "supposed to hold off on any follow-up with Samsung." Trial Exhibit 4252 (Email

7  from N. Shepherd to W. Deley, dated Oct. 4, 2004) ("are we [Ernst & Young] still supposed to

8  hold off on any follow-up with Samsung?"); Trial Tr. at 884:22-25, 886:2-7; V100 (Video

9  Testimony of W. Deley) at 69:22-70:2. Between October 4, 2004 and November 13, 2004

10  neither Ernst & Young nor Younghwa Accounting Firm had made any effort to "move the

11  [Samsung] audit forward" due to instruction from Rambus not to initiate contact with Samsung.

12  Trial Tr. at 885:1-21, 886:2-7.

13       o. On November 13, 2004, Rambus instructed Mr. Shepherd to set up a

14  conference call with Samsung about the audit. Trial Tr. at 888:2-6. Around the middle of

15  December 2004, In-Sang Yoo of Younghwa Accounting Firm conducted a site visit of Samsung's

16  offices in Korea. Trial Tr. at 888:11-18, 889:3-7. Mr. Shepherd was not personally present at this

17  site visit, but he learned about it from an email sent by Simon Yoo who similarly was not

18  present. Trial Tr. at 888:21-889:12.

19       p. After In-Sang Yoo's mid-December 2004 site visit, Mr. Shepherd reported to

20  Rambus that Samsung was not going to deal with Ernst & Young again. Trial Tr. at 889:13-25.

21       q. As of January 18, 2005, Mr. Shim understood that Samsung had provided all

22  the documents necessary to complete the audit and further understood that Younghwa

23  Accounting Firm expressed that that there were no more outstanding issues with respect to the

24  audit. Trial Tr. at 285:8-15 (admissible only to show Mr. Shim's understanding). Mr. Shim

25  understood that Younghwa Accounting Firm would contact Samsung's accounting department if

26  the firm had a need for further documents. Trial Tr. at 285:16-19.

27       r. During a February 2, 2005 meeting between the parties, Mr. Shim remarked

28  that the Ernst & Young Korean auditors confirmed with Samsung that they had what they needed

for the audit and did not require further information. Trial Tr. at 286:12-22; Exh. 4260 (Jared

1    Smith's handwritten notes from a February 2, 2005 Samsung-Rambus meeting) ("Heard from

2    local audit team that things were okay").

3          s. After Younghwa Accounting Firm visited Samsung on January 18, 2005,

4    neither it nor Ernst & Young made any further requests of Samsung for materials, information or

5    assistance.  Trial Tr. at 286:8-16.

6          t. Rambus made a proposal to Samsung for a renewal of the 2000 SDR/DDR

7    Agreement on February 20, 2005. Exh. 4263 (Email from I. Blumberg to J. Shim re: DRAM).

8          u. In February 2005, Rambus continued to accept royalty reports and payments

9    from Samsung.  Trial Tr. at 255-256; Exh. 4429 (Samsung 4Q 2004 Royalty Statement, dated

10    Feb. 17, 2005).

11          v. Between January of 2005 and March of 2005, Rambus did not ask Ernst &

12    Young to contact Samsung. Trial Tr. at 891:21-24.  Then, on March 18, 2005, the day Rambus

13    settled with Infineon, Mr. Deley sent Mr. Shepherd an email requesting that he "confirm that

14    there has been zero continued cooperation by Samsung relative to the royalty audit." Trial Tr. at

15    890:1-6; Exh. 4264 (Settlement and License Agreement between Rambus and Infineon, effective

16    March 18, 2005).

17          x. Mr. Deley's Infineon-Settlement-Day email informed Mr. Shepherd that

18    Samsung has "been saying that they have been fully cooperating on the audit. Please confirm the

19    facts, i.e., update your status." Trial Tr. at 890:16-891:12.  After Mr. Deley's March 18, 2005

20    request that Mr. Shepherd "confirm that there has been zero continued cooperation by Samsung

21    relative to the royalty audit," Mr. Blumberg sent a letter to Mr. Shim on April 1, 2005 stating:

22        since the royalty rate per the terms of the Agreement are based on per unit
         calculations, please advise your accounting group as soon as possible that it will
23       need to track sales of all licensed DRAMs in order to provide timely the quarterly
         reports required by section 4.2 of the Agreement and to pay the corresponding
24       royalties. This report is likely to be complex due to the itemized data required. As
         you recall, there are ongoing accounting issues that we have notified you
25       constitute an uncured breach of the Agreement and we would like to avoid any
         additional problems.
26

27    Exh. 4268 (Letter from I. Blumberg to J. Shim, dated Apr. 1, 2005) at 2. Notably, in the same

28    April 1 letter, Mr. Blumberg told Mr. Shim: "I believe it would be in the best interest of both our

   companies to initiate substantive discussions regarding renewal and expansion of license

1   coverage as soon as possible. As you know, renewal discussions are also required by § 8.5 of the

2   Agreement." *Id.*

3              y.  After Mr. Blumberg sent this April 1, 2005 letter, he sent an email to

4   Mr. Deley explaining he "desperately need[s]" a detailed summary of the status of Rambus's

5   royalty audit with Samsung due to an unexpected meeting with Mr. Shim of Samsung. Exh.

6   10260 (Email from N. Shepherd to W. Deley re: Samsung Audit Issues, dated Apr. 6, 2005)

7   ("Jared and I are meeting Jay Shim of Samsung rather unexpectedly in about 36 hours. I need a

8   detailed summary of the status of our royalty audit with Samsung . . . . Sorry for the short notice,

9   but I desperately need this information no later than 24 hours from now. Thanks for your help,

10  Ira."). Mr. Deley forwarded Mr. Blumberg's email to Mr. Shepherd on April 5, 2005, stating:

11  "Nigel, this is an important issue. We need a basic update on the issues." Trial Tr. at 893:13-15;

12  Exh. 10260 (Email from N. Shepherd to W. Deley, dated Apr. 6, 2005)

13             z.  In response to Rambus's March 18th and April 5th requests, Mr.

14  Shepherd sent Rambus an email update on the audit on April 6, 2005. Trial Tr. at 894:21-24;

15  Exh. 10260 (Email from Nigel Shepherd to William Deley, dated April 6, 2005). That email did

16  not include any information about the January 18, 2005 visit by Younghwa Accounting Firm.

17  Exh. 10260 (Email from N. Shepherd to W. Deley, dated Apr. 6, 2005). Most of the information

18  contained in Mr. Shepherd's April 6, 2005 email is derived from "updates from his field team"

19  which include conversations Mr. Shepherd had with Simon Yoo and In Sang Yoo of the

20  Younghwa Accounting Firm, or Excel tracking spreadsheets sent to him by email and, last

21  updated "sometime" in September of 2004. Trial Tr. at 906:5-907:1, 907:11-908:2. It had been

22  at least three months since Mr. Shepherd had spoken with anyone from Samsung. Trial Tr. at

23  891:18-24; Ex. 10260 (Email from N. Shepard to W. Deley dated April 6, 2005).

24             aa.  Rambus never told Samsung that there was any basis for it not to

25  negotiate in good faith for a mutually satisfactory patent license until June 3, 2005. Trial Tr. at

26  1041:1-8.

27             bb.  Rambus accepted Samsung's royalty payments for Q1 2005 on May

28  24, 2005. Trial Tr. at 255-256; Exh. 4430 (Samsung's Royalty Statement for 1Q, 2005, dated

May 23, 2005).

1                 cc.  On June 6, 2005 Rambus purported to terminate the 2000 SDR/DDR

2  Agreement citing Samsung's "failure to comply with the auditing provisions of Section 4[.]"

3  Trial Tr. at 304:5-14; 305:5-8; Exh. 4276 (Letter from J. Danforth to J. Shim, dated June 6,

4  2005) ("[d]espite having ample opportunity to cure since receiving written notice, Samsung still

5  has not complied with these auditing provisions. This letter is to inform you that in view of

6  Samsung's continued breach and failure to cure . . . Rambus hereby immediately terminates the

7  SDR/DDR License Agreement.").

8                 dd.  Rambus did not offer in evidence any exhibits that were delivered to

9  Samsung before Rambus terminated the 2000 SDR/DDR License that revealed the underpayment

10  by Samsung of royalties in excess of five percent for three consecutive audits nor did Rambus

11  introduce any audit papers prepared by the Younghwa Accounting Firm. Rambus's purported

12  termination of the 2000 SDR/DDR License for Samsung's alleged failure to comply with its audit

13  obligations appears to have been for strategic purposes and the failure to comply was a pretextual

14  reason given for the termination..

15       **4.**       **Rambus Did Not Breach the SDR/DDR License By Failing to Negotiate in Good Faith An Extension or Renewal**

16

17            The parties dispute (1) whether Rambus breached its duty to negotiate in good

18  faith an extension of the SDR/DDR License or a new patent license agreement to replace the

SDR/DDR License, (2) whether the good faith provision is definite enough to be enforced and

19  (3) what the appropriate remedy is, if Rambus did breach an enforceable duty. The court makes

20  the following factual findings with respect to these issues.

21

22            a.  Section 8.5 of the 2000 SDR/DDR License provides:

23     8.5     Assuming that this Agreement has not been terminated and that Samsung is not in breach hereof, the parties shall meet, six (6) months before the expiration of this Agreement, to negotiate in good faith with a view to achieving a mutually

24     satisfactory patent license agreement under the Rambus Patents with respect to the Licensed Products, including, without limitation, an extension hereof or a new

25     agreement.

26  *Id.* § 8.5. 186.

27            b.  The negotiation history of the 2000 SDR/DDR License shows that the parties

28  never agreed that any extension or renewal would be one that gave Samsung some form of most

favored licensee status. On August 10, 2000, Mr. Steinberg sent a draft license agreement to Mr.

Shim. That draft did not contain any obligation to negotiate a renewal or extension in good faith, or any provision that contained language resembling what was eventually adopted as Section 8.5. Exhs. 4208, 4209.

c. On October 6, 2000, Mr. Shim sent a proposed term sheet to Mr. Steinberg that requested that Mr. Steinberg add a provision in which Rambus would agree that the parties would negotiate in good faith any extension or renewal terms to the present Agreement, and that the royalty terms of such extension or renewal terms would not exceed the present royalty terms. Under such a provision, the parties could further negotiate in good faith terms relating to any additional patents or licensed products. Exh. 4214 at ¶ 9 (emphasis added).

d. A few days later, on October 11, 2000, Mr. Steinberg incorporated some but not all of Samsung's suggested provisions for what became Section 8.5 in the draft agreement. Exh. 4217 (red-lines within for October 11, 2000 draft). Specifically, the language in the October 11, 2000 draft said nothing about royalty terms for an extension or renewal not exceeding "the present royalty terms" in Section 3.1 of the license under discussion. *Id.*

e. On October 16, 2000, Mr. Shim responded with suggested revisions to the October 11, 2000 draft. Mr. Shim copied Charles Donohoe, Samsung's counsel, on those communications. Before sending the October 16 proposed revisions, Mr. Shim consulted with Mr. Donohoe. V105 (6/9/2008 Depo. of Jay Shim at 205:21-206:6). Mr. Shim asked that Section 3.8, the most favored licensee provision in the draft agreement, be included in the list of provisions that would survive termination or expiration of the agreement. Exh. 4215 at ¶ 17.

f. That same day, Mr. Steinberg responded and did not include Section 3.8 in the list of provisions that would survive termination or expiration of the agreement. Exh. 4216, ¶ 17; Exh. 4217, § 8.6 (no revision to include 3.8).

g. On October 21, 2000, Mr. Steinberg sent an executed SDR/DDR License to Mr. Shim. Exh. 4222.

h. On October 26, 2000, Mr. Shim sent an email to Mr. Steinberg, in which Mr. Shim requested four changes. Specifically, Mr. Shim requested (1) that the arbitration procedure be removed from the agreement, (2) *a "representation" from Mr. Steinberg "that 'Rambus Patents' in Section 1.12(i) are intended to cover all Licensed Products and their future*

1  *parametrically improved versions," (3) "8.5 to reflect that in the 'extension' or 'new agreement,'*

2  *Samsung is guaranteed to the most favorable royalty condition in the manner afforded in the*

3  *present agreement,"* and (4) that the termination period in Section 8.4 change to thirty days from

4  sixty days for both parties. Exh. 4223 (Emphasis added).

5        .      i. The next day, on October 27, 2000, Mr. Steinberg sent a revised, signed

6  SDR/DDR License. Mr. Steinberg stated in his letter that "to the extent possible, we have

7  incorporated your latest requests into the enclosed Agreement." Exh. 4224 at 2. Mr. Steinberg

8  incorporated two of Mr. Shim's four suggested revisions. First, the arbitration procedure in

9  Section 9.3 was removed. Compare Exh. 4222, § 9.3 with Exh. 4224 at 26-27. Second, the

10 termination period in Section 8.4 was changed to thirty days from sixty days. Compare Exh.

11 4222, § 8.4 with Exh. 4224, § 8.4. The revised, signed October 27, 2000 document did not

12 incorporate Mr. Shim's requested changes for Section 1.12(i) or Section 8.5. Specifically, it

13 made no change to Section 8.5 to provide that in any extension or new agreement, Samsung

14 would be guaranteed any most favorable royalty conditions.

15         j. On October 31, 2000, Mr. Shim called Mr. Steinberg. Exh. 4227. Mr.

16 Shim followed up that phone call with an email to Mr. Steinberg at 1:48 a.m. on October 31,

17 2000 that said Jon Kang had executed the SDR/DDR License. *Id.* Moreover, it said: "I'm now

18 working on Section 8.5 (i.e., the most favorable royalty condition in the extension or in new

19 agmt.) wording and will have that for you soon. As you indicated we'll attach a post-execution

20 amendment to resolve this." *Id.*

21         k. The SDR/DDR License was signed by Jon Kang of Samsung on October 31,

22 2000 without modification of Section 8.5. Exh. 4226. The language in Section 8.5 in the final

23 SDR/DDR License is the same as the language proposed by Rambus on October 11, 2000.

24 Compare Exh. 4217, § 8.5 (no red-line indicates language is same as October 11, 2000 draft)

25 with Exh. 4226 § 8.5.

26         l. On November 7, 2000, Mr. Shim sent Mr. Steinberg a draft Amendment A to

27 the SDR/DDR License. Exh. 4230. Samsung's draft Amendment A provided that Section 8.5

28 would be amended to add the following language: "Rambus agrees that in such an extension or a

new agreement, the royalty rates, such as the ones specified in Section 3.1 herein, or effective

1  royalty rates shall in no event be greater than those agreed to by any other then current or

2  prospective licensees of Rambus for substantially similar categories of licensed products." Exh.

3  4231.

4          m.  On November 21, 2000, Mr. Steinberg replied to Mr. Shim's November 7,

5  2000 email and said "[a]ttached please find a revised amendment to the Patent License

6  Agreement." Exh. 4232.  In the attached revised amendment, Mr. Steinberg proposed different

7  language to be added to Section 8.5: "Rambus agrees that in such an extension or a new

8  agreement, the royalty rates for any category of products corresponding to SDR SDRAM, SDR

9  SGRAM, DDR SDRAM and DDR SGRAM shall not be greater than the royalty rates paid by

10  other current or prospective licensees under the Rambus Patents for any category of products

11  corresponding to SDR SDRAM, SDR SGRAM, DDR SDRAM, and DDR SGRAM." Exh.

12  4233.

13          n.  Neither of the proposed amendments to Section 8.5 reflected in Exhibits 4231

14  or 4233 was ever signed byeither party.  Trial Tr. at 248:19-22.  Therefore, those proposed

15  provisions were not incorporated into the SDR/DDR License either expressly or impliedly

16  because Section 10.9 requires any "alteration, amendment, waiver, cancellation or any other

17  change in any term or condition of [the] Agreement . . . [to] have been mutually assented to in

18  writing by both parties." Exh. 4226, § 10.9.

19          o.  Samsung never agreed to any amendment to Section 8.5 because, as Mr.

20  Shim related, Samsung believed "about this time, and for the period of many months that

21  followed, there were some serious concerns as to Rambus's I.P., and we were reviewing many

22  different aspects of lawsuits that were going on." Trial Tr. at 248:28-249:3.  Not signing the

23  amendment because of uncertainty on Samsung's side suggests that Samsung made a conscious

24  decision not to sign any amendment due to its uncertainty as to a future relationship with Rambus

25  and thus not wanting to commit itself further.  Although Mr. Shim claimed at trial that the

26  amendment was important to Samsung, his testimony before trial that he had no recollection

27  whatsoever of any effort by him or anyone at Samsung to change Section 8.5 from October 27

28  through the end of 2000 makes suspect his trial testimony of its importance.  V105 (6/9/2008

Depo. of J.  Shim at 143:20-144:13, 239:5-10).

1        p.  Mr. Shim acknowledged in an August 2005 evidentiary hearing that Samsung

2    did not have any most favored licensee protection for any extension of the SDR/DDR License or

3    in any new agreement that replaced or followed it, but rather that the most favored licensee

4    provisions of Section 3.8 were limited to the five-year term of the SDR/DDR License.

5    Specifically, Mr. Shim testified that the SDR/DDR License "provided a most favored nations

6    clause while it was in effect, but it did not provide any commitment on Rambus's part that

7    Samsung would be given a most favored nation clause in a renewal agreement."  He further

8    elaborated that the SDR/DDR License "provided most favored nation during those terms.

9    Obviously, we did not talk about terms of the renewal."  Trial Tr. at 928:21-929:16.

10        q.  Mr. Donohoe testified that Samsung "would not have wanted an exact

11    extension of the agreement" but rather would have "wanted to be able to renegotiate the

12    economic terms of the agreement."  He further explained: "So I don't think [Samsung] asked for

13    an out and out extension of the agreement."  V103 (5/14/08 Depo. of Charles Donohoe at

14    133:1-11).

15        r.  In May 2001, after the initial verdict adverse to Rambus in the Infineon

16    litigation, Samsung told Rambus it intended to withhold its first quarter 2001 royalty payments

17    while it evaluated the litigation.  Trial Tr. at 735:15-22; Exhs. 9109, 9112.

18        s.  In the following weeks, the parties negotiated Amendment No. 1 to the

19    SDR/DDR License, effective July 11, 2001.  Exh. 4240.  In Paragraph 8 of Amendment No. 1,

20    Rambus and Samsung agreed as follows:

21          Assuming that the Agreement, as revised herein, has not been terminated
        and that Samsung is not in breach thereof, the parties shall meet six (6) months

22        before the expiration of the Agreement, to negotiate in good faith with a view to
        achieving a mutually satisfactory patent license agreement under the Rambus

23        Patents with respect to the Licensed Products, including, without limitation, an
        extension of the Agreement or a new agreement.  Rambus agrees that in such an

24        extension or a new agreement, the royalty rates for SDR/DDR IC's and/or
        SDR/DDR memory modules *shall not be greater than the royalty rates paid by*

25        *other current or prospective licensees and further shall not be greater than the*
        *royalty rate as specified under Section 3.1 of the Agreement*, in the event that

26        Rambus receives a lump sum payment, in lieu of royalties calculated based on a
        percentage of Net Sales, on Licensed Products from another licensee prior to

27        termination or expiration of the Agreement, then the parties agree to negotiate in
        good faith to modify the payment terms of the Agreement.

28

1    Exh. 4240, ¶ 8 (emphasis added). The italicized language was added to Paragraph 8 of the 2001

2    Amendment, and is not present in Section 8.5 of the SDR/DDR License. Compare Exh. 4226, §

3    8.5, with Exh. 4240, ¶ 8. The addition of this language in Amendment No. 1 suggests that an

4    obligation to agree to most favored licensee rates is not implicit in the duty to negotiate in good

5    faith or else the additional language would be mere surplusage.

6            t. Amendment No. 1 also provided that "[i]n the event that Rambus licenses . . .

7    Infineon AG, then anytime after March 31, 2002, Rambus may terminate this Amendment No. 1

8    upon (10) days written notice from Rambus to Samsung of the license . . . and the terms of the

9    Agreement shall resume in force thereafter." *Id.* at ¶ 7.

10           u. By at least July 2004, Rambus pressed Samsung to begin renewal negotiations

11    for a license that would replace or follow the expiration of the SDR/DDR License.

12           v. Samsung and Rambus met on July 9, 2004 in Korea. Rambus's attendees

13    included Mr. Blumberg, Jared Smith, John Danforth, and Joe Moniz. Samsung's attendees

14    included Mr. Shim and some of his associates. Trial Tr. at 259:3-17, 945:22-946:6.240.

15           x. Rambus made a PowerPoint presentation to Mr. Shim and the other Samsung

16    attendees at this July 9, 2004 meeting. Trial Tr. at 258:15-18; Exh. 4251. Rambus presented its

17    position on why the SDR/DDR License did not cover DDR2. Trial Tr. at 946:7-16. Rambus set

18    forth its explanation of the contractual language in Sections 1.7 and 1.12 of the SDR/DDR

19    License and why the language did not cover DDR2 and subsequent generation products. Exh.

20    4251 at 46-49. Mr. Blumberg, invited Samsung to respond at the meeting with its position on

21    DDR2. *Id.* at 45; Trial Tr. at 946:17-20, 950:11-12. However, Mr. Shim did not offer any

22    explanation based on the contractual language or any other documents to show why DDR2 and

23    subsequent generation products were covered by the agreement. Trial Tr. at 947:1-14. Mr.

24    Blumberg encouraged Mr. Shim to begin renewal negotiations because the SDR/DDR License

25    and its Amendment No. 1 were set to expire in 2005. Mr. Blumberg testified that "as early as

26    that July 9th 2004 meeting," he "mentioned to Mr. Shim my concern that renewal negotiations

27    for agreements of this complexity typically took a significant amount of time and suggested that

28    we begin discussions of that renewal as quickly as possible to ensure that we didn't run out of

time to renew the agreement before the 2000 agreement expired." Trial Tr. at 950:25-953:6. In

1   response to Mr. Blumberg's desire to get the renewal negotiations started in 2004, Mr. Shim's

2   position was that there was "no need to rush." Mr. Shim told Mr. Blumberg that it was premature

3   to begin negotiations because those negotiations were not required until six months before the

4   expiration of the agreement, and Mr. Shim's interpretation of Amendment No. 1 was that it did

5   not expire until October 2005. Trial Tr. at 951:13-952:21. In response, Mr. Blumberg tried to

6   encourage Mr. Shim to negotiate because Mr. Blumberg "[felt] strongly that it was going to take

7   more than six months to negotiate a renewal." *Id.* at 953:1-4.

8          y.  From July 9, 2004 to February 20, 2005, Mr. Blumberg continued to press Mr.

9   Shim to begin renewal negotiations. Trial Tr. at 950:25-953:6.

10         z.  On February 20, 2005, Mr. Blumberg sent an offer for renewal to Mr. Shim.

11  Trial Tr. at 950:13-22; Exh. 4263 (the "February 20 Renewal Offer"). Rambus's February 20

12  Renewal Offer to Samsung proposed that Samsung make fixed quarterly payments of $12 million

13  in return for a license covering "all forms of DRAM, current and future." The offer contained a

14  trigger that would move the fixed quarterly payments to a "market rate once at least one other

15  major DRAM manufacturer is paying such market rates." Exh. 4263.

16         aa.  Mr. Shim testified that he did not "have a chance" to respond to the February

17  20 Renewal Offer. Trial Tr. at 289:21-24 ("I did not get a chance to address this proposal"),

18  320:2-4 ("I don't think I ever had a chance to respond to this proposal"), 333:21-23 ("We never

19  got a chance to respond to that."). However, Mr. Shim had more than two weeks to consider the

20  February 20 Renewal Offer before he met in person with Mr. Blumberg, Mr. Danforth, and Mr.

21  Smith on March 8, 2008 at Rambus's offices in Los Altos, California. Trial Tr. at 953:14-22.

22  Then, at the March 8 meeting, Mr. Shim had further opportunity to discuss, consider, and

23  evaluate the February 20 Renewal Offer. At this March 8 meeting, Rambus orally presented the

24  Offer. Trial Tr. at 953:23-954:3. In response, Mr. Shim said "it was too early to get into hard

25  core renewal negotiations as we were still well beyond the six-month period before the end of

26  October." *Id.* at 954:6-10. Mr. Blumberg explained to Mr. Shim that it was a "sweetheart deal"

27  compared to the amount that Samsung would owe going forward under the running royalty rates

28  in Section 3.1 of the SDR/DDR License, and Mr. Blumberg explained to Mr. Shim that the

February 20 Renewal process information accurately Offer was time-sensitive and would be

1  withdrawn if Rambus settled the ongoing litigation with Infineon. *Id.* at 954:17-956:1.

2  Specifically, Mr. Blumberg testified that "I made it clear that this offer was only good until such

3  time as the Infineon settlement occurred." *Id.* at 955:24-956:1.  Mr. Blumberg explained that

4  Rambus was in a trial with Infineon that was expected to finish at the end of March, that there

5  was a possibility Rambus would lose its trial with Infineon, and Rambus would be willing to

6  appeal the Infineon loss if it had an agreement in place with Samsung.  Trial Tr. at 955:7-956:1.

7  However, Mr. Blumberg told Mr. Shim that if the Samsung agreement was not in place, then

8  Rambus was likely to settle with Infineon, "in which case Rambus would no longer see a value to

9  offering a sweetheart deal to Samsung." *Id.* at 955:19-23.  Mr. Blumberg explained to Mr. Shim:

10  "… I believe it would be in the best interest of both our companies to initiate substantive

11  discussions regarding renewal and expansion of license coverage as soon as possible."  Exh.

12  4268 at 2.   Further, Mr. Blumberg told Mr. Shim that he would be in Tokyo the week of April 5-

13  9 and if "you are available in Tokyo during that time, I would be happy to arrange my schedule to

14  meet with you."  Exh. 4268 at 2.

15     bb.  On March 21, 2005, Rambus and Infineon signed a settlement agreement.

16  Exh. 4264.  On March 22, 2005, Mr. Blumberg sent a facsimile to Mr. Shim informing him of

17  the settlement and attaching a copy of a press release containing certain information.  Exh. 4265.

18  Mr. Blumberg's March 22, 2005 letter also gave notice that Rambus was terminating the 2001

19  Amendment per the terms of the Amendment.  *Id.*   Ten days after notice, the governing

20  agreement was again the 2000 SDR/DDR License.

21     cc.  On March 24, 2005, Mr. Shim wrote to Mr. Blumberg and requested a copy

22  of the Infineon Settlement Agreement.  Exh. 4267.

23     dd.  Mr. Blumberg declined to provide Mr. Shim a copy of the Infineon

24  Settlement Agreement based upon Rambus's confidentiality obligations to Infineon. Trial Tr. at

25  957:7-10; Exh. 4264 (Infineon Settlement Agreement ¶ 12.3).  Mr. Blumberg explained to Mr.

26  Shim this restriction on his ability to share the agreement. Trial Tr. at 957:7-10; Exh. 4268 at 1

27  ("Since these agreements are confidential, I cannot disclose any such agreement to you as you

28  have requested.").  However, in addition to sending Mr. Shim the press release describing the

Infineon settlement, Mr. Blumberg did later answer Mr. Shim's questions about the Infineon

1    Settlement Agreement after the agreement was signed. Trial Tr. at 957:11-17. In addition, Mr.

2    Shim had a copy of the redacted Infineon Settlement Agreement that was publicly available

3    through Rambus's Securities and Exchange Commission ("SEC") filing in 2005. Trial Tr. at

4    312:20-23 (Mr. Shim's testimony that he saw the redacted copy of the Infineon agreement filed

5    with the SEC); Trial Tr. at 957:18-958:18 (Mr. Blumberg's testimony identifying Exhibit 10324A

6    as the redacted agreement in the SEC filing); Exh. 10324A. The publicly available information

7    about the Infineon settlement disclosed the term of Infineon's license, the fact that neither party

8    could terminate the license for any reason prior to its expiration, the dismissal of litigation

9    between the parties, the amount of the three payment caps, the amount of the quarterly payments,

10    the scope of the patents covered, the scope of the products licensed, and the confidentiality

11    obligations under the agreement. Exh. 10324A.

12                    ee. On April 1, 2005, Mr. Blumberg wrote to Mr. Shim and withdrew Rambus's

13    February 20 Renewal Offer. Exh. 4268.

14                    ff. Mr. Blumberg and Mr. Smith met with Mr. Shim on April 7, 2005 at a coffee

15    shop at the Grand Hyatt in Tokyo. The "primary focus of Mr. Shim's interest in the meeting" was

16    "discussing and getting more details about the Infineon agreement." Trial Tr. at 960:8-12.

17    During that meeting, Mr. Blumberg told Mr. Shim that "the Infineon agreement involved a lump

18    sum payment and that there was no royalty rate that would be comparable in any way or that

19    would trigger Section 3.8 of that 2000 agreement." At the April 7, 2005 meeting, Mr. Shim,

20    according to Mr. Blumberg, did not make any proposal of any kind. Trial Tr. at 961:15-16. On

21    direct examination on September 23, 2005, Mr. Shim first testified that he did not recall any

22    specific terms being discussed at the April 2005 meeting in Tokyo. Trial Tr. at 330:15-24. The

23    next day, on re-direct, he testified that at the April 2005 meeting in Tokyo, Samsung made a

24    renewal proposal with terms "consistent with what was in place for Infineon" including coverage

25    of all patents and all DRAM products, a five year capture period, and "some scale version of

26    Infineon royalty rate." *Id.* at 447:4-448:17. However, he could not recall specific terms of a

27    Samsung proposal.

28                    gg. On May 11, 2005, the parties met in Tokyo at Samsung's offices. Trial

1   Tr. at 961:17-21. Mr. Blumberg and Mr. Smith attended on behalf of Rambus. *Id.* at 962:19-21.

2   At this meeting, Mr. Shim suggested some "high-level terms" that Samsung thought "would have

3   to be included in a renewal." *Id.* at 962:22-963:12. Mr. Shim did not propose any specific price

4   terms other than to say that price needed to be "in line with the Infineon deal." *Id.* at 963:13-21.

5   Mr. Shim did not "go into any details about what in line meant or in that neighborhood might

6   have been." *Id.* Mr. Shim did not mention any numbers. *Id.* at 963:22-23. In response to these

7   high level terms from Mr. Shim, Mr. Blumberg explained that a broad license such as that

8   requested by Mr. Shim would be difficult for Rambus, but that "it was a possibility if we could

9   agree on a reasonable price for such a license." *Id.* at 963:24-964:6.

10          hh. At the April 7, 2005 or the May 11, 2005 meeting, Mr. Blumberg told Mr.

11  Shim that Rambus would be happy to continue with the terms of the original SDR/DDR License

12  in a renewal. Trial Tr. at 1012:25-1013:11 . He does not recall whether coverage for DDR2 was

13  discussed. *Id.* at 1013:12-14.

14          ii. On May 18, 2005, Mr. Blumberg sent a further proposal to Mr. Shim. In this

15  proposal, Mr. Blumberg explained that based on recent events related to the DOJ investigation of

16  Samsung for price-fixing, the parties' discussions to date, and the "very short time available to us

17  to conclude a deal," Rambus had "determined that we cannot reach, on agreeable terms, the five

18  year patent license renewal deal you desire." Exh. 4271. Instead, Mr. Blumberg proposed that

19  "we focus on one of the options we have already discussed, namely, a one year standstill

20  agreement between the parties." *Id.* He reiterated that "[c]onclusion of such an agreement before

21  July 1 remains a top priority for Rambus." *Id.* Then, Mr. Blumberg set forth a series of specific

22  terms for a one year standstill, with price terms that would provide Samsung "the prorated

23  amount paid for such quarter by Infineon . . . multiplied by the ratio of Samsung's DRAM

24  revenue for such quarter compared to Infineon's DRAM revenue for such quarter." *Id.* This

25  amount paid under the standstill was to be a credit against royalties owed for Samsung's DRAM

26  sales during the standstill period once the parties had negotiated a new license. *Id.* According to

27  Mr. Blumberg, at the time he sent the May 18, 2005 standstill proposal, the parties had been

28  discussing the possibility of (a) doing a renewal based on the 2000 SDR/DDR License, (b) doing

    a renewal based on the terms that Samsung had requested, provided that the price was mutually

1    agreeable, or (c) entering into a standstill. He testified that any one of those three options would

2    have been acceptable to Rambus. Trial Tr. at 1045:21-1046:5.

3                 jj. In the May 18, 2005 standstill proposal, Mr. Blumberg stated that he was

4    looking forward to discussing the proposal with Mr. Shim on May 24, 2005. Exh. 4271.

5                 kk. On May 24, 2005, Mr. Blumberg, Mr. Smith, and Mr. Danforth met with Mr.

6    Shim and his team at Rambus's offices in Los Altos, California. Trial Tr. at 964:19-965:3. The

7    purpose of the meeting was to get Samsung's feedback on the May 18 proposal and to "move

8    forward on renegotiating a standstill agreement." Trial Tr. at 965:6-9. Mr. Blumberg told Mr.

9    Shim why he proposed a standstill rather than a renewal. Trial Tr. at 965:10-966:17 (explaining

10   that because Samsung had uncertainty about the enforceability of Rambus's patents and because

11   Samsung appeared unwilling to pay a significant amount of money for a renewal, a standstill

12   made sense because it allowed the parties more time to assess the uncertainties and "more time to

13   negotiate comfortably a full renewal agreement"). In response, Mr. Shim agreed that the parties

14   "did not seem to be converging on a renewal deal" and was "open to the discussion of the

15   standstill." Id. at 966:18-22. However, he did not tell Rambus what price Samsung would be

16   willing to pay for a standstill or a renewal. Trial Tr. at 966:23-967:9.

17                ll. During both the May 11, 2005 and May 24, 2005 meetings, there was

18   discussion of Rambus's concern about Samsung's potential involvement in antitrust violations.

19   Trial Tr. at 967:10-13. This issue was also mentioned in Mr. Blumberg's May 18 standstill offer.

20   Exh. 4271. Mr. Blumberg explained that the antitrust issues came up because "Samsung had

21   indicated [in the renewal negotiations] that it would require a full release of all past liability,

22   including all antitrust liability in the renewal agreement." Trial Tr. at 967:16-20. Mr. Shim

23   acknowledged this. Trial Tr. at 331:19-332:6. Mr. Blumberg elaborated that "in order to

24   evaluate and properly value the antitrust release, [Rambus] needed to discuss this [antitrust]

25   evidence and those issues with Samsung." Trial Tr. at 968:4-6.

26                mm. Throughout the negotiations, Mr. Blumberg "kept telling Mr. Shim I wanted

27   to engage in negotiations to get that deal done. I thought the relationship between the companies

28   was an important one for both companies and I didn't want the lack of this agreement to be an

     impediment to that relationship." Trial Tr. at 1044:10-22. Further, Mr. Blumberg testified that

1   "at every opportunity, I encouraged Mr. Shim to engage with me in negotiations for a renewal

2   because, among other things, that was one of the main focuses of my job." *Id.* at

3   1044:23-1045:1.

4               nn.   On June 3, 2005, Mr. Shim sent Mr. Blumberg Samsung's standstill offer.

5   Exh. 4273; Trial Tr. at 968:10-13.  Samsung's June 3 standstill offer proposed a $3.5 million

6   payment for the second quarter of 2005, and $3.5 million per quarter payments for the one-year

7   standstill.  Exh. 4273, §§ 4, 7.  It proposed that the parties would negotiate a five-year renewal in

8   good faith no later than the start of the fourth quarter of 2005.  *Id.* at § 5.  For that renewal

9   agreement to be negotiated, the term would be no less than five years with the royalty paid in

10  unspecified "fixed quarterly payments," the covered products would include all DRAM,

11  including DDR2+ and XDR, all Rambus patents would be covered, and there would be a $200

12  million cap on any payments.  *Id.* at §§ 8-8.4.  Samsung's June 3 proposal had a most favored

13  licensee provision that provided Samsung's royalty "under the Renewal Agreement will be

14  effectively less than that of any other future Rambus licensees" and Samsung will get "the right

15  to audit future third party license agreements and replace financial terms of the Renewal

16  Agreement with those provided in any future third party license." *Id.* at § 9.  The June 3 proposal

17  also suggested that if any one Rambus patent was ruled unenforceable by any court, regardless of

18  whether the ruling was final or later overturned on appeal, Samsung would have the option to

19  terminate the renewal agreement and all sales of Licensed Products prior to termination would be

20  deemed licensed and paid in full.  *Id.* at § 10.  Mr. Blumberg testified that the proposal "shocked"

21  him and was "particularly troubling" because it seemed "incredibly one-sided."  Trial Tr. at

22  1050:15-1051:9.

23              oo.  The parties met again on June 6, 2005 in Santa Clara, California.  Trial

24  Tr. at 968:16-23.  Mr. Blumberg, Mr. Danforth, and Mr. Smith attended on behalf of Rambus

25  and Mr. Shim and some of his associates attended on behalf of Samsung.  *Id.* at 968:24-969:3.

26  At that meeting, Mr. Shim explained his June 3 proposal, but never provided calculations or

27  numbers to explain how he derived the $3.5 million per quarter payment proposal or the $3.5

28  million proposal for the second quarter of 2005.  Trial Tr. at 969:9-971:18.  Instead, Mr. Shim

spoke only in high level terms, stating that "due to the uncertainty of the value of Rambus's

1   patents, Samsung was not comfortable paying more than that amount." *Id.* In response, Mr.

2   Blumberg explained that Rambus was "extremely concerned and worried that this was a low ball

3   offer that Samsung was throwing on the table as if throwing down the gauntlet to say either take

4   this offer or there will be other results." *Id.* at 971:19-972:2. Specifically, Rambus's

5   representatives told Mr. Shim that "we were concerned that if we did not accept this offer, it was

6   his and Samsung's intention to file suit against Rambus." *Id.* at 972:3-6. During the June 6, 2005

7   meeting, Rambus reiterated its willingness to negotiate a deal "along the lines of" Rambus's May

8   18 proposal. Trial Tr. at 972:7-15. Samsung did not accept Rambus's May 18 proposal. *Id.* at

9   972:16-21. Then, Rambus offered another proposal–this time a 30-day standstill proposal that

10  addressed some of Rambus's concerns about Samsung initiating litigation. Trial Tr. at

11  972:22-973:8; Exh. 4275. Mr. Shim and his colleagues took a break from the negotiations to

12  privately confer for approximately an hour about the 30-day standstill proposal. Trial Tr. at

13  973:9-20. When they returned, they rejected Rambus's offer. *Id.* at 973:21-24. At no point

14  during the renewal negotiations did Samsung make an offer for renewal that included a price.

15  Trial Tr. at 974:13-16. During these renewal negotiations, no one from Samsung ever told Mr.

16  Blumberg that Section 8.5 of the SDR/DDR License required Rambus to give Samsung the

17  Infineon settlement deal. Trial Tr. at 973:25-974:6 (Mr. Blumberg's testimony that the first time

18  he had heard that theory from Samsung was during trial).

19          pp.   Samsung's 30(b)(6) corporate designee on the 2005 license negotiations,

20  Seung Bum Ko, testified that "Rambus, as well as Samsung also, made its best good faith [effort]

21  to cooperate for a renewal negotiation." V109 (7/25/08 Depo. of S.B. Ko at 199:24:200:1).

22  Exhibit 9270 (30(b)(6) notice, topic 15).

23          qq.   Rambus brought two pre-prepared letters to the June 6, 2005 meeting.

24  Trial Tr. at 1030:22-24. One letter contained a 30-day standstill that gave Rambus the unilateral

25  right to initiate any future litigation between the parties in the forum of its choice, and the other

26  letter terminated the 2000 SDR/DDR Agreement due to Samsung's alleged failure to comply with

27  the auditing provisions of the license. Trial Ex. 4275 (Unexecuted 30-day Standstill Agreement,

28  dated June 6, 2005); Trial Ex. 4276 (Letter from J. Danforth to J. Shim re: terminating 2000

SDR/DDR Agreement, dated June 6, 2005); Trial Tr. at 304:5-14, 1030:25-1031:2, 1032:1-5.

1    Any bad faith by Rambus in connection with its purported termination of the 2000 SDR/DDR

2    Agreement was not a substantial factor in the parties' failure to reach an extension or renewal

3    agreement as the parties' had irreconcilable differences on the value of Rambus's technology.

4                rr.   Rambus filed patent infringement lawsuits against Samsung on June

5    6, 2005 in the Northern District of California. (Complaint for Patent Infringement and Jury

6    Demand, Case No. C-05-02298, dated June 6, 2005; First Amended Complaint for Patent

7    Infringement and Jury Demand, Case No. C-05-00334, dated June 6, 2005).

8                              **CONCLUSIONS OF LAW**

9    **A.**       **Rambus Breached the SDR/DDR License By Failing to Give Samsung the Benefit of**

10                **the Royalty Rate Obtained By Infineon in its Settlement with Rambus**

                **1.**      **"Royalty Rate" Includes the Quarterly Installment Payments in the**

11                       **Rambus/Infineon License Agreement**

12        The parties dispute whether the Rambus/Infineon Settlement Agreement involved

13    a "royalty rate" as that term is used in Section 3.8 (most favored licensee provision) in the 2000

14    SDR/DDR License between Rambus and Samsung. Rambus was required to extend to Samsung

15    any "royalty rate agreed to be paid . . . by a Third Party . . . for products corresponding to SDR

16    SDRAM, DDR SDRAM, SDR SGRAM, DDR SGRAM [that] is lower than that specified in

17    Section 3.1(b)" of the SDR/DDR License. Exh. 4226 § 3.8 (emphasis added). The issue

18    presented is one of contract interpretation. California's rules of contract interpretation apply. *Id.*

19    at § 9.1.

20        "The fundamental goal of contractual interpretation is to give effect to the mutual

21    intention of the parties." *Powerine Oil Co. v. Superior Court*, 37 Cal. 4th 377, 390 (2005). The

22    mutual intent of the parties is to be inferred, if possible, from the written provisions of the

23    contract. Cal. Civ. Code § 1639. Samsung contends that the term "royalty rate" in the 2000

24    SDR/DDR License applies to the $5.85 million quarterly payments under the Infineon Settlement

25    and License Agreement. Rambus argues that "royalty rate" refers to "running royalty rates"

26    computed as a percentage of sales and does not include the quarterly installment payments agreed

27    to by Infineon. Rambus further argues that what the parties contemplated by Section 3.8 was the

28    identification of a "lower royalty rate" from a third-party agreement that could be applied to

1  Samsung in a straight forward manner and "be subject to automatic application" with no

2  negotiation between the parties necessary to effectuate its provisions.

3        The plain language of Section 3.8 supports Samsung's interpretation. It reflects an intent

4  to protect Samsung from competitive disadvantage. *See, e.g., Cardinal of Adrian, Inc. v.*

5  *Amerock Corp.*, 208 U.S.P.Q. 822, 823 (E.D. Mich. 1979) ("The most favored nation clause is

6  intended to guarantee . . . that no licensee will be given the *opportunity* to use this patent at a

7  more favorable rate."). This intent is reinforced by the "Whereas" clauses which state that

8  Rambus intends to charge future licensees more than that paid by Samsung.

9        The term "royalty rate" is understood to include lump sum payments for the use of

10  technology.  "Technical words are to be interpreted as usually understood by persons in the

11  profession or business to which they relate, unless clearly used in a different sense."  Cal. Civ.

12  Code § 1645; *see Denver D. Darling, Inc. v. Controlled Env'ts Const., Inc.*, 89 Cal. App. 4th

13  1221, 1236 (2001).  Courts have noted that the term "royalty rate" or "rate of royalty" within the

14  field of patent licensing is generally understood to include lump-sum payments of various types.

15  *See, e.g., Hazeltine Co. v. Zenith Radio Co.*, 100 F.2d 10, 16 (7th Cir. 1938) (noting that the

16  court could not "escape the conclusion that a provision in a patent-license contract which

17  provides for the payment of fixed sum of money per fixed period of time for the use of a patented

18  invention states a rate of royalty within the generally understood and recognized meaning of that

19  phrase"); *Cardinal of Adrian, Inc.*, 208 U.S.P.Q. at 823.  Samsung's economic expert, Dr. Keith

20  Ugone, gave essentially unrebutted expert testimony that the term "royalty rate" in licensing

21  agreements can refer to a number of different royalty structures, including the variable royalty

22  rate found in the Infineon Settlement and License Agreement.

23        Rambus itself used "royalty rate" to refer to the installment payments by Infineon under

24  its settlement agreement with Rambus.  In its SEC filings, Rambus used the terms "royalty,"

25  "rate" and "royalty rate" to describe the payment terms in the Infineon Settlement and License

26  Agreement, including specifically the $5.85 million quarterly rate.

27        Interpretation of the term "royalty rate" to not include quarterly lump sum payments

28  would fly in the face of what the parties intended to accomplish by Section 3.8.  Although the

mutual intent of the parties is to be determined, if possible, from the written provisions of the

1    contract, the court must consider extrinsic evidence that is "relevant to prove a meaning to which

2    the language of the instrument is reasonably susceptible." *Pac. Gas & Elec. v. Thomas Drayage*

3    *& Rigging Co.*, 69 Cal. 2d 33, 37 (1968). The negotiations leading up to the execution of the

4    2000 SDR/DDR License clearly show that the intent of the parties was to ensure that Samsung

5    would not be at a competitive disadvantage with third parties specifically including Infineon.

6    Geoff Tate, Rambus's Chief Executive Officer, assured Samsung that Rambus would charge

7    Infineon, Hynix, and Micron "substantially higher license fees and royalty rates." Exh. 4218.

8    Neil Steinberg reassured Samsung during negotiation of the 2000 SDR/DDR Agreement that he

9    had modified the language in a related section of the agreement to "provide language expressing

10    the fundamental intent of Section 3.9 that Samsung not be put at a competitive disadvantage as a

11    result of entering into the Agreement." Exh. 4216. Rambus at the time the SDR/DDR License

12    was signed desperately needed an alliance with Samsung and, therefore, was willing to assure

13    Samsung of favored treatment.

14         The mutual intent of Rambus and Samsung as determined by the words used in the

15    SDR/DDR License and the extrinsic evidence detailing the surrounding circumstances in which

16    they negotiated the contract supports Samsung's interpretation of "royalty." A review of the parol

17    evidence shows that Section 3.8 is reasonably susceptible, in fact only susceptible, to the

18    interpretation urged by Samsung.

19    **2.    The Rambus/Infineon Settlement Triggered Rambus's Obligation to
         Samsung Under Section 3.8 of the 2000 SDR/DDR License**

20

21         The Infineon Settlement and License Agreement (i.e., the variable royalty rate as set forth

     in Article 6) contains a "royalty rate" agreed to be paid by Infineon for, among other things, the
22
     products that were specified in Section 3.8 of the 2000 SDR/DDR Agreement. Specifically, the
23
     royalty rate agreed of $5.85 million per quarter that Infineon agreed to pay for, among other
24
     things, the relevant products subject to Samsung's most favored licensee rights was clearly
25
     "lower than [Samsung's royalty rate as] specified in Section 3.1(b)" for the second quarter of
26
     2005. Pursuant to Section 3.8 of the 2000 SDR/DDR Agreement, Rambus was obligated to
27
     make that rate effective for Samsung as of April 1, 2005, "the first day of the royalty reporting
28
     period in which written notice" was required by the reinstatement of Section 3.8 following

1   Rambus's termination of the 2001 Amendment.  "It is likely to be generally true that a licensor's

2   grant of more favorable terms is supported by a sound business reason, but the benefit of more

3   favorable terms is exactly what the person whose license includes an MFL clause has bargained

4   for and to which he is entitled." *Studiengesellchaft Kohle m.b.H. v. Novamont Corp.*, 704 F.2d

5   48, 53 (2d Cir. 1983); *see Cardinal of Adrian*, 208 U.S.P.Q. at 823 ("[W]here a patent licensor

6   has later granted a paid up license for a sum certain, a licensee who has a most favored nation

7   clause is entitled to a paid-up license for the same sum.").

8       **3.      Rambus Breached Section 3.8 of the 2000 SDR/DDR License Agreement**

9           The elements of a claim for breach of contract are: "(1) the contract; (2) plaintiff's

10  performance or excuse for nonperformance; (3) defendant's breach; and (4) the resulting damages

11  to plaintiff." *See, e.g., Reichert v. Gen. Ins. Co. of Am.*, 68 Cal. 2d 822, 830 (1968).  There is no

12  dispute that the parties entered into a contract (2000 SDR/DDR License).  Samsung performed.

13  (Rambus's claim that Samsung failed to comply under the audit provision was not proved).

14  Samsung was damaged when Rambus refused to make the $5.85 million per quarter royalty rate

15  paid by Infineon effective for Samsung on April 1, 2005.[2]  Samsung has established by a

16  preponderance of evidence that Rambus breached the 2000 SDR/DDR License by such refusal.

17      **4.      Rambus Failed to Prove that Samsung Breached the Audit Provision of the
            SDR/DDR Agreement**

18

19  _____

20  [2] Rambus has not sought to recover royalties that otherwise would be due under the license for
    the second quarter of 2005. Rambus purportedly terminated the license based on the alleged audit

21  breach on June 6, 2005, which was before both the end of the license term (June 30, 2005) and
    the date when Samsung's payment obligation for the second quarter of 2005 otherwise would

22  have come due. (Exh. 4226 at § 4.2). Rambus did not have a right to terminate the license based
    on the audit breach. As a result, Rambus's decision to terminate the license in favor of suing

23  Samsung before the end of the license term constituted a repudiation of the license and hence a
    material breach of it. *See, e.g., Sackett v. Spindler*, 248 Cal. App. 2d 220, 229 (Cal. App. 1st Dist.

24  1967) (noting that a party that terminates a contract based on anything less than a material breach

25  by its counterparty unlawfully repudiates the agreement and places it "in total breach" of the
    contract); 13-68 Corbin on Contracts § 68.3 ("If under the circumstances, however, a party's

26  breach is a total breach, the injured party's duty of performance is discharged, including the
    obligation to compensate, on the contract, for any part performance."). As a result, Rambus

27  cannot enforce the license to recover royalties that otherwise would have been due for the second

28  quarter of 2005. *See Cox v. Ocean View Hotel Corp.*, 533 F.3d 1114, 1121 (9th Cir. 2008); *De
    Burgh v. De Burgh*, 39 Cal. 2d 858, 863 (Cal. 1952); *Kaiser Trading Co. v. Associated Metals &
    Minerals*, 321 F. Supp. 923, 929 (N.D. Cal 1970).

1    Rambus claims it properly terminated the 2000 SDR/DDR Agreement on the basis that

2  Samsung breached its audit obligations under Section 4.1 of that agreement. However, Rambus

3  did not establish such a breach by a preponderance of the evidence. Rambus did not offer any

4  exhibits that were delivered to Samsung that revealed the alleged underpayment and Rambus

5  accepted Samsung's royalty payment for the first quarter of 2005 without objection. In addition,

6  the timing and circumstances existing at the time Rambus purportedly terminated the 2000

7  SDR/DDR Agreement suggest that Rambus's purported termination for the alleged audit breach

8  was pretextual and the real reason was the advantage it sought it could achieve by instituting a

9  lawsuit for patent infringement.

10  **B.    Rambus Did Not Breach the SDR/DDR License By Failing to Negotiate in Good
         Faith An Extension or Renewal**

11

12         **1.    Section 8.5 Did Not Require Rambus to Offer an Extension or Renewal that
                Covered DDR2 SDRAM and Subsequent Product Generations**

13    Under Section 8.5 of the 2000 SDR/DDR License the parties agreed "to negotiate in good

14  faith with a view to achieving a mutually satisfactory patent license agreement under the Rambus

15  Patents *with respect to Licensed Products*, including, without limitation, an extension hereof or a

16  new agreement." (Emphasis added). Samsung contends that Section 1.7's definition of

17  "DDR/SDRAM(s)" includes DDR2 SDRAM and subsequent product generations and, therefore

18  as "Licensed Products" were required to be included in the parties' attempt to achieve a "mutually

19  satisfactory patent license agreement." Rambus maintains that Samsung's DDR2 and subsequent

20  product generations are beyond the scope of DDR SDRAM as defined in Section 1.7.

21    As previously discussed, under California law "[t]he fundamental goal of contractual

22  interpretation is to give effect to the mutual intention of the parties" (*Powerine Oil Co.,* 37 Cal.

23  4th at 390) and the mutual intent of the parties is to be inferred, if possible, from the written

24  provisions of the contract. Cal. Civ. Code § 1639. Nevertheless, the court must consider

25  extrinsic evidence that is "relevant to prove a meaning to which the language of the instrument is

26  reasonably susceptible." *Pac. Gas & Elec.,* 69 Cal. 2d at 37. The plain language of Section 1.7

27  supports Rambus's postion that Samsung's DDR2 products are not covered because they are not

28  identical to the eight specific Samsung products identified in Section 1.7, nor do they merely add

one of the approved differences set forth in Section 1.7. Further, during negotiation of the 2000

1   SDR/DDR License Rambus, as acknowledged by Samsung, did not want the Agreement to cover

2   future DRAM generations and did not budge from its originally proposed definition of "Licensed

3   Products."

4        Samsung argues that Mr. Steinberg represented to Mr. Shim during the negotiations that

5   the Agreement as proposed covered evolutionary changes and that all of the differences between

6   Samsung's DDR and DDR2 products are evolutionary changes.  What Mr. Steinberg did say in

7   an email was that he felt that Section 1.7 "adequately covers devices which may have

8   evolutionary (as opposed to revolutionary) differences from the devices specified by part

9   number."  Exh. 4216 at 1.  Mr. Steinberg did not represent that all evolutionary changes would be

10  covered, nor did the parties ever discuss what each understood "evolutionary" to mean.  Most

11  importantly, the Agreement did not use the term "evolutionary" or "revolutionary."  The language

12  of the SDR/DDR License is not reasonably susceptible to an interpretation that any change that is

13  "evolutionary" is covered by the approved listed differences in Section 1.7.  Therefore, Rambus

14  had no good faith obligation under Section 8.5 to include Samsung's DDR2 and subsequent

15  product generations in the parties' attempt to achieve a "mutually satisfactory patent license

16  agreement."

17        **2. The Parties Never Agreed Expressly or Impliedly that Samsung Would**
          **Receive Most Favored Licensee Protection in a Renewal of the SDR/DDR**
18        **License or in a New Patent License Agreement**

19        Samsung sought during negotiation of the SDR/DDR Agreement assurance that it would

20  continue to have most favored licensee status following the expiration of the Agreement.  When

21  Samsung signed the SDR/DDR Agreement, there was no provision promising a most favored

22  royalty condition in any extension or new patent license.  However, Mr. Shim and Mr. Steinberg

23  had agreed to negotiate an amendment to the SDR/DDR Agreement to address this concern.  Mr.

24  Shim sent Mr. Steinberg a proposal shortly after the SDR/DDR Agreement was executed and Mr.

25  Steinberg shortly thereafter sent a proposed revised amendment.  Mr. Shim did not respond and

26  neither proposed amendment was ever signed.  Samsung did not respond to Mr. Steinberg's

27  proposal because Samsung believed "about this time, and for the period of many months that

28  followed, there were some serious concerns as to Rambus's I.P., and we were reviewing many

different aspects of lawsuits that were going on."  Trial Tr. at 248:19-22.  Therefore, no most

1   favored royalty or licensee provision can be incorporated into the SDR/DDR License either

2   expressly or impliedly because (1) one was never agreed to and (2) Section 10.9 of the

3   SDR/DDR Agreement required any "alteration, amendment, waiver, cancellation or any other

4   change in any term or condition of [the] Agreement . . . [to] have been mutually assented to in

5   writing by both parties." Exh. 4226, § 10.9.

6        Samsung's contends that the covenant of good faith and fair dealing implied in the 2000

7   SDR/DDR Agreement required Rambus to offer an extension or a new patent license agreement

8   that recognized most favored licensee status for Samsung.  The implied covenant of good faith

9   and fair dealing that exists in all contracts is limited to assuring compliance with the express

10  terms of the contract, and cannot be extended to create obligations not contemplated in the

11  contract. *Racine & Laramie, Ltd. v. Department of Parks & Recreation*, 11 Cal. App. 4th 1026,

12  1032 (1993).  No express term of the 2000 SDR/DDR License required Samsung to be given

13  most favored licensee status on renewal of the License or in a new patent license agreement. The

14  parties had an obligation to negotiate in good faith, but despite discussing the inclusion of a most

15  favored licensee provision in Section 8.5 of the 2000 SDR/DDR Agreement, the parties for

16  whatever reason, knowingly did not do so and thus their good faith obligation did not include

17  negotiation of most favored licensee protection.

18      **3.    The Failure of the Parties to Negotiate an Extension to the SDR/DDR**
           **Agreement or a Mutually Satisfactory New License Agreement Was Not**
19         **Caused by Any Lack of Good Faith**

20       Rambus initiated renewal negotiations in July 2004, which was well before the six month

21  deadline required by Section 8.5 of the 2000 SDR/DDR License for the commencement of

22  negotiations.  Rambus made an offer for renewal on February 20, 2005.  Samsung never accepted

23  Rambus's February 20, 2005 Renewal Offer.  Samsung's assertion that this offer was withdrawn

24  in bad faith before Samsung had a chance to respond to it is not supported by the evidence.  To

25  the contrary, the evidence demonstrates that Samsung had nearly six weeks to consider that

26  renewal offer, was informed that the offer was time sensitive and was warned that it would be

27  withdrawn in the event that Rambus settled with Infineon.  Rambus met with Samsung

28  representatives on March 8 to discuss the renewal offer nearly a month before it was ultimately

     withdrawn.

1    After Rambus settled with Infineon and withdrew its February 20 Renewal Offer,

2  Rambus continued to make efforts to negotiate with Samsung.  Rambus presented several options

3  for renewal and for a standstill agreement between April 1, 2005 and June 6, 2005.  The May 18

4  standstill offer from Rambus was not in bad faith even though it did not offer a full renewal or

5  extension.  The evidence demonstrated that both parties thought it made sense to switch to a

6  standstill given the uncertainties about a renewal expressed by both sides.  Moreover, Mr.

7  Blumberg testified that the goal of a standstill agreement was to reach resolution of the dispute

8  before the expiration of the SDR/DDR License in such a way that it allowed more time for the

9  parties to negotiate and come to agreement on a renewal or extension.

10    Rambus considered Samsung's June 3 offer to be a low-ball offer with one-sided terms,

11  and as a result, was worried Samsung was not taking the negotiation seriously.  However, the

12  pretextual termination of the SDR/DDR License and filing suit against Samsung at the end of

13  their negotiation session on June 6, 2005, the date that turned out to be their last day of

14  negotiation, was not part of a good faith negotiation but rather a tactic designed to gain a

15  litigation advantage if Rambus decided that the parties were not going to reach agreement.

16  However, that tactic did not cause the parties' failure to reach agreement.  As of June 6, 2005 the

17  parties clearly had irreconcilable differences about the value of a license of Rambus's patents.

18    "Good faith [does] not require [a party] to accede to . . . one-sided modifications."

19  *Auerbach v. Great Western Bank*, 74 Cal. App. 4th 1172, 1191-92 (1999).  *See also Phoenix*

20  *Mut. Life Ins. Co. v. Shady Grove Plaza Ltd. Partnership*, 734 F. Supp. 1181, 1190 (D. Md.

21  1990) ("The duty [to bargain in] good faith . . . does not prohibit a party from bargaining to its

22  own economic advantage . . . .").  As stated by the Seventh Circuit in *A/S Apothekernes*

23  *Laboratorium for Specialpraeparater v. I.M.C. Chem. Group*, 873 F.2d 155, 159 (7th Cir. 1989):

24    In a business transaction both sides presumably try to get the best of the deal.
     That is the essence of bargaining and the free market.  And in the context of this
25    case, no legal rule bounds the run of business interest.  So one cannot characterize
     self-interest as bad faith.  No particular demand in negotiations could be termed
26    dishonest, even if it seemed outrageous to the other party.  The proper recourse is
     to walk away from the bargaining table, not to sue for "bad faith" in negotiations.

27

28  The failure of the parties to agree did not result from the breach of the duty to negotiate in good

   faith.

### 4. Even If Rambus Breached an Obligation to Negotiate in Good Faith, Samsung Has Not Proved an Entitlement to Damages

In *Copeland v. Baskin Robbins U.S.A.* the California court of appeals recognized that a cause of action exists under California law for breach of a contract to negotiate. 96 Cal. App. 4th 1255-60 (2002). The court, however, cautioned that the "uncertain concept" of "bad faith" should not permit an aggrieved party to claim the benefit of a contract that was never consummated and restricted the damages available to a plaintiff in duty-to-negotiate cases: "the appropriate remedy for breach of a contract to negotiate is not damages for the injured party's lost expectations under the prospective contract but damages caused by the injured party's reliance on the agreement to negotiate." *Id.* at 1260-61. The court further explained:

> For obvious reasons, damages for breach of a contract to negotiate an agreement are measured by the injury the plaintiff suffered in relying on the defendant to negotiate in good faith. This measure encompasses the plaintiff's out-of-pocket costs in conducting the negotiations and may or may not include lost opportunity costs. The plaintiff cannot recover for lost expectations (profits) because there is no way of knowing what the ultimate terms of the agreement would have been or even if there would have been an ultimate agreement.

*Id.* at 1262-63.

Here, Samsung did not seek nor offer evidence of any damages sustained in reliance upon Rambus's commitment to negotiate a renewal agreement in good faith. Samsung seeks only expectation damages–that is, the value of a renewal or new agreement that the parties never made. For this reason, even if it had been able to prove that Rambus breached its duty to negotiate in good faith for a renewal agreement, Samsung would not be entitled to expectation damages.

## C. Samsung's Affirmative Defense of Equitable Estoppel

Samsung argues that Rambus should be equitably estopped from seeking patent infringement damages beyond the royalties paid by Infineon for the products that would have been covered by the renewal license Samsung contends that Rambus was obligated to enter. Samsung bases its argument on the assurances Rambus made to Samsung during the negotiation of the 2000 SDR/DDR License that Samsung would have a competitive advantage over those who chose to litigate with Rambus, by fulfilling its obligations under the 2000 SDR/DDR

1  Agreement and by its willingness to negotiate in good faith under Section 8.5 of the 2000

2  SDR/DDR License.

3       To establish an estoppel defense, Samsung had the burden to prove:"(a) a representation

4  or concealment of material facts (b) made with knowledge, actual or virtual, of the facts (c) to a

5  party ignorant, actually and permissibly, of the truth (d) with the intention, actual or virtual, that

6  the ignorant party act on it, and (e) that party [relied] on it [to his injury]." 13 Witkin, Summary

7  10th (2005) Equity, § 191 at 527-28; *Wood v. Blaney*, 107 Cal. 291, 295 (1895); *Wells Fargo*

8  *Bank v. Bank of America*, 32 Cal. App. 4th 424, 438 (1995). Moreover, in order to meet the

9  reliance requirement, the party seeking an estoppel must demonstrate that the reliance was

10 reasonable. *Martinez v. Scott Specialty Gases, Inc.*, 83 Cal. App. 4th 1236, 1248 (2000) (holding

11 that "[e]stoppel requires, among other things, reasonable reliance on the other party's actions" and

12 rejecting estoppel where "plaintiffs could not reasonably have been misled") (emphasis in

13 original). Samsung did not establish that it could reasonably have relied on Rambus's alleged

14 promises that Samsung would be granted protections vis-à-vis its competitors in litigation with

15 Rambus beyond those set forth in the language of the 2000 SDR/DDR License itself. Samsung is

16 a sophisticated company that was represented by experienced lawyers in the 2000 licensing

17 negotiations with Rambus. The parties, through their lawyers, established a fully-integrated

18 written agreement that expressly established California law as the applicable state law. In

19 California, the Supreme Court had long held that, under the parol evidence rule, evidence of prior

20 or contemporaneous agreements or understandings between the contract negotiators cannot be

21 used to "add to, detract from, or vary the terms" of the parties' written agreement. *Pacific Gas &*

22 *Elec. Co.*, 69 Cal. 2d at 37. To the extent Samsung purports to have relied upon its own

23 interpretation of Section 3.8 based on extra-contractual statements made by Rambus's negotiators

24 that were not incorporated into the terms of the 2000 SDR/DDR License, such reliance was

25 inherently unreasonable. Samsung also could not reasonably have relied on the alleged promise

26 that Rambus would offer the "Infineon deal" in any renewal or extension of the SDR/DDR

27 License because such reliance would have added a promise to Section 8.5 which is not an

28 automatic renewal provision and expressly states that the parties agree only to negotiate in good

1   faith "with a view to achieving a mutually satisfactory" agreement Exh. 4226 at § 8.5.  Section

2   8.5 identifies no terms that were to be carried over into any new licensing agreement.

3   **D.      Findings of Fact and Conclusions of Law**

4           The disposition of Counts I-III and the affirmative defense of equitable estoppel required

5   by these Findings of Fact and Conclusions of Law will be incorporated into any judgment that is

6   later entered in either of the captioned cases.  An unredacted version of these Findings and

7   Conclusions is filed under seal.  These Revised Redacted Findings and Conclusions have been

8   prepared in response to Rambus' identification of the portions that should be redacted from the

9   publicly filed copy.

10

11  DATED: _____5/14/09_____

12                                                  _Ronald M Whyte_____
                                                    RONALD M. WHYTE
13                                                  United States District Judge

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Notice of this document has been electronically sent to counsel in: all cases.

| Counsel | Email | Appearances: | | | |
|---|---|---|---|---|---|
| | | 05-00334 | 05-02298 | 06-00244 | 00-20905 |
| **Rambus:** | | | | | |
| Kathryn Kalb Anderson | Kate.Anderson@mto.com | x | | x | |
| Peter A. Detre | detrepa@mto.com | x | x | x | x |
| Erin C. Dougherty | erin.dougherty@mto.com | x | x | x | x |
| Sean Eskovitz | sean.eskovitz@mto.com | x | x | x | x |
| Burton Alexander Gross | Burton.Gross@mto.com | x | x | x | x |
| Keith Rhoderic Dhu Hamilton, II | keith.hamilton@mto.com | x | x | x | x |
| Pierre J. Hubert | phubert@mckoolsmith.com | x | x | x | x |
| Andrea Jill Weiss Jeffries | Andrea.Jeffries@mto.com | x | x | x | |
| Miriam Kim | Miriam.Kim@mto.com | x | x | x | x |
| Carolyn Hoecker Luedtke | carolyn.luedtke@mto.com | x | x | x | x |
| Steven McCall Perry | steven.perry@mto.com | x | x | x | x |
| Jennifer Lynn Polse | jen.polse@mto.com | x | x | x | x |
| Matthew Thomas Powers | mpowers@sidley.com | x | | | |
| Rollin Andrew Ransom | rransom@sidley.com | x | x | x | x |
| Rosemarie Theresa Ring | rose.ring@mto.com | x | x | x | x |
| Gregory P. Stone | gregory.stone@mto.com | x | x | x | x |
| Craig N. Tolliver | ctolliver@mckoolsmith.com | x | x | x | x |
| Donald Ward | Bill.Ward@mto.com | x | x | x | |
| David C. Yang | david.yang@mto.com | x | x | x | |
| Douglas A. Cawley | dcawley@mckoolsmith.com | | | x | |
| Scott L Cole | scole@mckoolsmith.com | | | x | |
| William Hans Baumgartner, Jr | wbaumgartner@sidley.com | | | | x |
| Scott W. Hejny | shejny@sidley.com | | | | x |
| Kelly Max Klaus | kelly.klaus@mto.com | | | | x |
| Catherine Rajwani | crajwani@sidley.com | | | | x |
| Thomas N Tarnay | ttarnay@sidley.com | | | | x |
| **Hynix:** | | | | | |
| Theodore G. Brown , III | tgbrown@townsend.com | x | x | x | x |
| Daniel J. Furniss | difurniss@townsend.com | x | | | x |
| Joseph A. Greco | jagreco@townsend.com | x | | | x |
| Julie Jinsook Han | JJHan@townsend.com | x | x | x | |
| Tomomi Katherine Harkey | tharkey@omm.com | x | | | x |
| Jordan Trent Jones | jtjones@townsend.com | x | | | x |
| Patrick Lynch | plynch@omm.com | x | | | x |
| Kenneth Lee Nissly | kennissly@omm.com | x | | x | x |
| Kenneth Ryan O'Rourke | korourke@omm.com | x | | | x |
| Belinda Martinez Vega | bvega@omm.com | x | x | x | x |
| Geoffrey Hurndall Yost | gyost@thelenreid.com | x | x | x | x |
| Susan Gregory van Keulen | svankeulen@omm.com | x | | x | x |
| Allen Ruby | ruby@allenrubylaw.com | | | | x |
| **Micron:** | | | | | |
| Robert Jason Becher | robertbecher@quinnemanuel.com | x | | x | x |
| John D Beynon | john.beynon@weil.com | x | x | x | x |
| Jared Bobrow | jared.bobrow@weil.com | x | x | x | x |
| Yonaton M Rosenzweig | yonirosenzweig@quinnemanuel.com | x | | x | x |
| Harold Avrum Barza | halbarza@quinnemanuel.com | | | x | |
| Linda Jane Brewer | lindabrewer@quinnemanuel.com | | | x | |
| Aaron Bennett Craig | aaroncraig@quinnemanuel.com | | | x | x |

| Name | Email | | | | |
|------|-------|---|---|---|---|
| Leeron Kalay | kalay@fr.com | | | x | |
| David J. Lender | david.lender@weil.com | | | x | |
| Rachael Lynn Ballard McCracken | rachaelmccracken@quinnemanuel.com | | | x | |
| Sven Raz | sven.raz@weil.com | | | x | |
| David J. Ruderman | davidruderman@quinnemanuel.com | | | x | |
| Elizabeth Stotland Weiswasser | elizabeth.weiswasser@weil.com | | | x | |
| **Nanya:** | | | | | |
| Jason Sheffield Angell | jangell@orrick.com | x | x | x | x |
| Kristin Sarah Cornuelle | kcornuelle@orrick.com | x | x | x | |
| Chester Wren-Ming Day | cday@orrick.com | x | | | |
| Jan Ellen Ellard | jellard@orrick.com | x | | x | |
| Vickie L. Feeman | vfeeman@orrick.com | x | x | x | |
| Robert E. Freitas | rfreitas@orrick.com | x | | | |
| Craig R. Kaufman | hlee@orrick.com | x | | | |
| Hao Li | hli@orrick.com | x | | | |
| Cathy Yunshan Lui | clui@orrick.com | x | | | |
| Theresa E. Norton | tnorton@orrick.com | x | | | |
| Mark Shean | mshean@orrick.com | x | | | |
| Kaiwen Tseng | ktseng@orrick.com | x | | | |
| **Samsung:** | | | | | |
| Steven S. Cherensky | steven.cherensky@weil.com | x | x | | |
| Dana Prescott Kenned Powers | dana.powers@weil.com | x | x | x | |
| Matthew Douglas Powers | matthew.powers@weil.com, matthew.antonelli@weil.com | x | x | | |
| Edward Robert Reines | Edward.Reines@weil.com | x | x | | x |
| **United States Dept. of Justice** | | | | | |
| May Lee Heye | may.heye@usdoj.gov | | | | x |
| Eugene S. Litvinoff | eugene.litvinoff@usdoj.gov | | | | x |
| Niall Edmund Lynch | Niall.Lynch@USDOJ.GOV | | | | x |

Counsel are responsible for distributing copies of this document to co-counsel that have not registered for e-filing under the court's CM/ECF program in each action.

**Dated:**      5/14/09                                    TER
                                              **Chambers of Judge Whyte**